LEON ROSENWALD, Appellant, v. MIDDLEBROOK, Administrator of Estate of CHARLES WINSER ADAMS, et al.

### Division Two, March 30, 1905.

1. **SPECIFIC PERFORMANCE: Contract to Make a Will: Character of Proof.** A court of equity will specifically enforce a contract to make a will in a particular manner, where a valuable consideration has been received for the promise and fraud would be perpetrated upon the promisee or beneficiary unless the contract be enforced. But the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character. And the importance and value of a strict adherence to the rule are emphasized by the safeguards with which the law must surround land titles and the ownership of property.

2. ———: ———: How Considered. An effort to distribute, by a contract resting in parol, the estate of a deceased person to persons other than those designated by the law to take it, is looked upon with jealousy, and the evidence relied upon to establish such a contract should be weighed in the most scrupulous manner.

3. ———: ———: Distinction: Between Enforcement and Resistance. In a suit for specific performance a distinction between a plaintiff seeking the enforcement of a contract in equity and a defendant resisting such performance should be observed. It requires much less strength of case on the part of defendant to resist a bill to perform a contract than it does on the part of plaintiff to maintain a bill to enforce specific performance.

4. ———: ———: Consideration. Before a court of equity will enforce a contract to make a will in a specific way, it must be made to appear that its consideration was predicated upon acts to be performed by the promisee or beneficiary, and that when performed they referred to and resulted from the contract and would not have been performed unless the contract had been made.

5. ———: ———: Definiteness. Some of the witnesses testified that deceased agreed to adopt the plaintiff and make him his heir; others, that the contract was to leave to plaintiff all the property of which deceased died possessed; others, that he had stated in his lifetime that all the property he possessed then belonged to plaintiff. *Held*, that there is an absence of such definiteness and clearness as to the terms of the contract as the law requires, and the proof resting almost exclusively upon declarations and admissions made by deceased, specific performance cannot be enforced.

6. ———: ———: ———: Working a Fraud: Sacrifice of Business. Even though the terms of the parol contract to make a will in a specific way may be definitely and clearly shown, courts of equity will refuse to enforce it unless a failure to do so would work a fraud upon the promisee or the beneficiary. And where the testimony reveals that the beneficiary sacrificed no business interests on his part in attempting to perform it, no fraud is permitted to be perpetrated by a refusal to enforce it, however censurable from a moral point of view the promisor may have been for his failure to comply with the agreement.

7. ———: ———: Sentiment. A parol contract made by a deceased to will to plaintiff all of the property of deceased is not to be treated, in a suit for a specific performance, as a mere matter of sentiment, but purely as a business transaction.

8. ———: ———: Significant Circumstance. Plaintiff seeks to enforce a contract, alleged to have been made with him by deceased, to will him all his property. Sometime after the contract is alleged to have been made, at a time both, being physicians, were about to start for the Cuban War, they went to the office of a lawyer for the purpose of having their wills made giving their property to each other. Plaintiff's will was drawn, but none was drawn for deceased. *Held*, that plaintiff's failure to urge, in the presence of the lawyer, the execution of a will by deceased, is a damaging and significant circumstance against plaintiff, tending to show that no such prior contract was recognized as existing between the two.

9. ———: ———: Absence of Writing. While the absence of a written contract for the giving by deceased of his property by will to plaintiff is not a matter for consideration in the disposition of a suit to enforce specific performance of the contract, yet the reasons why some effort was not made to preserve the evidence of such contract, when all the circumstances dictated that to be the reasonable course, should be considered.

10. ———: ———: Evidence: Relations to Kindred. The fact that deceased had had no communication with or kind feelings towards his own kindred, should not be considered in a suit to specifically execute an alleged contract by him to will his property to plaintiff who was not of blood relationship. If the facts entitle plaintiff to have the contract enforced, he has the right against the world, even against the children of deceased.

11. ———: ———: ———: Failure to Claim Property. In a suit to enforce a parol contract alleged to have been made by a deceased to will all his property to plaintiff, it is significant, as bearing on the question of the contract's existence, that, at the time the inventory was made, plaintiff claimed the professional library of deceased, as having been given to him by deceased, but did not at that time, nor for two years thereafter, claim any larger interest in his valuable estate.

12. ———: ———: ———: Declarations. Parol testimony of the declarations and admissions of deceased is not received with favor in a suit to prove the existence of a contract with him.

13. ———: ———: All Essential Elements. Courts of equity will not approve or encourage the absorption of entire estates of deceased persons by enforcing parol contracts alleged to have been made with them in their lifetime, without clear and undoubted proof of every essential element of the contract required by law, which are: first, a definite contract; second, clear, cogent and unequivocal proof of its character; third, performance by the promisee or beneficiary, as a result of the agreement; and, fourth, that a fraud would be perpetrated upon the plaintiff unless specific performance were enforced.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale,* Judge.

AFFIRMED.

*Scarritt, Griffith & Jones* and *I. J. Ringolsky* for appellant.

(1) In this State a court of equity will specifically enforce an oral contract to devise or leave all of one's property to another person in consideration of services rendered in the relation of an adopted son or otherwise. Such services are a valuable consideration and it would be a fraud upon the person rendering the services or acting in such capacity to refuse to enforce the contract. The contract and its performance may be established by the admissions and declarations of the party in default, together with all the other facts and circumstances in evidence. Halsa v. Halsa, 8 Mo. 303; Wright v. Tuisley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Hiatt v. Williams, 72 Mo. 214; West v. Bundy, 78 Mo. 402; Sharkey v. McDermott, 91 Mo. 647; Stone v. Pennock, 31 Mo. App. 544; Healey v. Simpson, 113 Mo. 340; Teats v. Flanders, 118 Mo. 660; Nowack v. Berger, 133 Mo. 24; Hall v. Harris, 145 Mo. 614; Alexander v. Alexander, 150 Mo. 579; Steele v. Steele, 61 Mo. 566; Lynn v. Hockaday, 162 Mo. 111; Kinney v. Murray, 170 Mo. 674; McElvain v. McElvain, 171 Mo. 244; Asbury v. Hicklin, 81 S. W. 390. (2) This court will try this case *de novo,* this being a suit in equity. The evidence given at the trial, both by deposition and orally, is presented to this court *in haec verba.* Although the Supreme Court has frequently said that in equity cases where the witnesses testify orally, it will defer somewhat to the findings of the chancellor, yet this court declared that "by such remarks we are not to be understood as meaning that we are concluded by the finding of facts by the court below—far from it; such remarks do not mean that we have abdicated our supervisory con-

trol over questions of fact in equity causes; they only mean that when there is a conflict of testimony, or where the testimony is evenly balanced and the finding of the chancellor appears to be correct, then we will so far defer to his finding as to sanction it by our affirmance; that and nothing more.'' Benne v. Schnecko, 100 Mo. 250; Blount v. Spratt, 113 Mo. 48; Parker v. Roberts, 116 Mo. 657; Lins v. Lenhardt, 127 Mo. 271; Dalrymple v. Craig, 149 Mo. 345; Alexander v. Alexander, 150 Mo. 598; Taliaferro v. Evans, 160 Mo. 380. (3) (a) A ''reasonable doubt'' must be actual; not a forced doubt. It should be strong, clear, fair and sensible, based on common sense; it should be a substantial, well-founded doubt. Proof of a fact. ''beyond a reasonable doubt'' does not mean proof to an absolute certainty, or absolute proof. A doubt, to be ''a reasonable doubt,'' must arise out of the evidence or want of evidence after a full consideration by the chancellor of all the evidence in the case. But this rule does not require that the proof shall be free from conflict. State v. Good, 132 Mo. 114; State v. Turner, 110 Mo. 198; State v. Gann, 72 Mo. 374; State v. Benham, 160 N. Y. 444; Dent v. State, 105 Ala. 14; People v. Finley, 38 Mich. 482; State v. Harrison, 23 Mont. 81; State v. Woodruff, 31 Fla. 320; Emery v. State, 101 Wis. 627; State v. Jefferson, 43 La. Ann. 995; State v. Senn, 32 S. C. 392; Carlton v. People, 150 Ill. 181; State v. Summer, 55 S. C. 32; State v. Coleman, 20 S. C. 455; Ferguson v. State, 52 Neb. 436; Talbert v. State, 121 Ala. 33; Goddard v. State, 42 Ill. App. 487. (b) A ''reasonable doubt'' is an honest, substantial misgiving, generated by the insufficiency of proof, not by the ingenuity of counsel, unwarranted by the testimony, nor one born of a merciful inclination to permit defendants to recover, nor one prompted by sympathy for a party to the suit or those connected with them. Hopt v. Utah, 120 U. S. 430; U. S. v. Harper, 33 Fed. 471; U. S. v. Newton, 52 Fed. 275.

*P. E. Hatch* and *C. O. Tichenor* for respondent.

(1) This court has refused "the open door" to. this kind of cases. From Sutton v. Shipp, 65 Mo. 297, to the present, the court has decided thirteen cases of this kind, if we have figured correctly. The decisions · were against claimant in all but four: Sharkey v. Mc-Dermott, 91 Mo. 647, where the petition was held good on demurrer; Alexander v. Alexander, 150 Mo. 579, where the claimants's case was made out by letters; Nowack v. Berger, 133 Mo. 24, where the consideration, for the adoption was the marriage of the mother to the one adopting, and Lynn v. Hockaday, 162 Mo. 111, where all conceded by the pleadings that the child had been adopted, but the question was whether it had been adopted by the husband or the wife. Two. of these cases, Asbury v. Hicklin and Grantham v. Gossett, were decided since the trial of this case. (2) Counsel claim that the finding and decree are entitled to no consideration in this court. We admit that, if this is not a case where the court should defer to the judgment of the chancellor, there can be none. In this kind of case this court said, in Goodin v. Goodin, 172 Mo. 48, "all the evidence was given orally in court before the chancellor. He was in a much better position to determine the credibility of the witnesses, to properly weigh their evidence and to reach a correct conclusion on the matters in controversy than we are." N. E. L. & T. Co. v. Browne, 177 Mo. 423; Asbury v. Hicklin, 81 S. W. 393. (3) In a suit to specifically perform an agreement for an interest in an estate and to declare the heirs, as to the realty, to be trustees to the extent of such interest, for plaintiff, the proof of the contract must be so cogent, clear and forcible as to leave no doubt in the mind of the chancellor as to its terms and character. There must be no doubt in the petition as to the statement of case or in the contract. There must be like proof that the acts done unmistakably re-

fer to and result from that contract. There must be no equivocation or uncertainty in the case. It must be in terms a contract and not a mere declaration of intention or expectation. In fine, there must be a contract definitely and conclusively proven. Casual and loose conversations, when not supported by other evidence, are entitled to little, if any, weight. This is dangerous testimony, is looked upon with jealously, and should be weighed in the most scrupulous manner. Agreements of this kind are looked upon with suspicion and ought not to be encouraged. These agreements are within the Statute of Frauds and are sustained only where it would work a fraud if one party was allowed to plead it. Goodin v. Goodin, 172 Mo. 48; McElvain v. McElvain, 171 Mo. 257; Kinney v. Murray, 170 Mo. 700; Steele v. Steele, 161 Mo. 575; Curd v. Brown, 148 Mo. 92; Fanning v. Doan, 139 Mo. 411; Nowack v. Berger, 133 Mo. 42; Teats v. Flanders, 118 Mo. 669; Cherbonnier v. Cherbonnier, 108 Mo. 264; Emmel v. Hayes, 102 Mo. 195; Veth v. Gierth, 92 Mo. 104; Asbury v. Hicklin, 81 S. W. 390; Reed v. Morgan, 73 S. W. 381; Grantham v. Gossett, 81 S. W. 895; Drake v. Lanning, 49 N. J. Eq. 459; McTague v. Finnegan, 54 N. J. Eq. 457; Woods v. Evans, 113 Ill. 191; Neals v. Gilmore, 79 Pa. 425; Miller's Estate, 136 Pa. 249; 8 Am. and Eng. Enc. Law (2 Ed.), 1017; Nickerson v. Nickerson, 127 U. S. 676; Purcell v. Miner, 4 Wall. 517; Williams v. Morris, 95 U. S. 444; Maddison v. Alderson, L. R. 8 App. Cas. 467; 10 U. S. App. 195; 134 Cal. 170; 99 Mo. App. 116. (4) In order to sustain such a contract there must be something for a consideration, which is "incapable of computation by any pecuniary standard." In this kind of contract, for consideration, there is surrendering by a father or mother of the child and its influences; the transferring of its affections; the sundering of the closest of ties; the affectionate services and care where people are aged; the impossibility of restoring a party to his

former condition; the value of all which can not be measured by dollars and cents. Healy v. Simpson, 113 Mo. 347; Gupton v. Gupton, 47 Mo. 45.

FOX, J.—This is a suit by the plaintiff seeking to have specifically performed a contract or agreement alleged to have been entered into by Dr. C. W. Adams, in his lifetime. The contract sought to be enforced is thus stated by the plaintiff in his petition:

"Plaintiff further states that about the latter part of May, 1897, the said C. W. Adams told this plaintiff he wanted to adopt him because of his affectionate feelings for this plaintiff, and previously stated that he wanted this plaintiff to fit up and furnish offices and rooms, and about the latter part of August, 1897, he stated that he wanted this plaintiff to leave his home and to stay with him and to practice medicine as a partner with him and be with him day and night, and the said C. W. Adams further stated that he wanted this plaintiff to look after all of his affairs, to look after his books, collections, property, and further stated that he wanted this plaintiff to be as a son to him, to attend to all his correspondence, to attend him personally as a son, a nurse and a physician, and further stated to this plaintiff that as he was breaking down in health and as he had consumption, he wanted this plaintiff to be close to him at all times, as long as he lived, that then in consideration of all this, he, the said C. W. Adams, upon his death would make this plaintiff his sole heir; that he would will to this plaintiff his entire estate owned by him at the time of his death, and that this plaintiff would come into possession of and own all of his, the said C. W. Adams's property and estate owned by the said C. W. Adams at the time of his death. And said C. W. Adams agreed with plaintiff if he would do all the foregoing acts, he, the said plaintiff, would at the time of the

death of the said C. W. Adams become the absolute owner of and become the absolute possessor of all the estate of said C. W. Adams, real, personal, mixed and moneys.

"And the plaintiff further states that the affection, confidence and respect that the said C. W. Adams had for and in him was reciprocated and that in consideration of the agreement, contract and the promises made by the said C. W. Adams, to make him his sole heir and to will to him, and leave him and possess him of his, the said C. W. Adams's entire estate, so that the entire estate and property owned by the said C. W. Adams at the time of his death would come into his, the plaintiff's, possession, and be his, the plaintiff's absolute property, he did consent that the said C. W. Adams might adopt him and actually did furnish and fit up offices and rooms and did leave his home and stay with the said C. W. Adams, and actually did practice medicine with the said C. W. Adams as a partner and did stay with him, the said C. W. Adams, by day and night and that he actually did look after all the affairs of said C. W. Adams and after all his rents, collections and property, and did perform all the duties and more than is usually and commonly performed by a son to a father, and yielded to the said C. W. Adams all the affection and respect and attention due from a son to a father.

"And plaintiff further alleges that he did attend to all the said C. W. Adams's correspondence and actually did attend to the said C. W. Adams as a son, a nurse and physician, and actually at all times did remain close to him, the said C. W. Adams. And plaintiff further states that he at all times was, dutiful, affectionate, obedient and respectful to the said C. W. Adams, and at all times complied with all his requests and up to the time of the death of the said

C. W. Adams always stood ready and willing to do and comply with all the demands and requests of the said C. W. Adams.

"Plaintiff further avers that at various times during the latter part of the year 1897, and at various times up to the death of the said C. W. Adams, he, the said C. W. Adams, frequently stated to this plaintiff and to others, in consideration of all that the plaintiff had done and agreed to do for him, and on account of his affection and love for this plaintiff, that upon his death this plaintiff would be the sole owner of all his property and estate.

"Plaintiff further states that during the year 1898, the said C. W. Adams stated that he had learned that he could not adopt this plaintiff because he was informed that one who had obtained his majority in years could not legally be adopted, and consequently the plaintiff was never adopted by the said C. W. Adams, but plaintiff further alleges that said C. W. Adams repeatedly stated that he would consider him as his son and would carry out his said agreement.

"Plaintiff further states that in about the month of May, 1898, the said C. W. Adams was a surgeon in Battery B, in the State of Missouri, and was making preparations to go to the Cuban War, but would not go unless this plaintiff attended and stayed with him as an attendant all the time, all of which this plaintiff agreed to do, and preparations by both the said C. W. Adams and this plaintiff were made to go to this said war, and it was agreed before leaving for said war that the said C. W. Adams should make a will, as he had frequently promised and agreed with this plaintiff to do, as heretofore stated, leaving all his property and estate to this plaintiff; and that in consideration of the love and affection that said plaintiff had for the said C. W. Adams, and as a further consideration for the said C. W. Adams making a will as stated herein, that he, the plaintiff, agreed to make a will,

leaving his entire estate at the time of his death, except a few nominal bequests to avoid a contest, to the said C. W. Adams. And the plaintiff further states that he did make such a will about the month of May, 1898, and the same was left and deposited with the defendant, Robert B. Middlebrook, and was not revoked or destroyed until long after the death of the said C. W. Adams.

"Plaintiff further states that the time of making his said will, had he died his estate would have been worth ten thousand dollars.

"Plaintiff further states that the said C. W. Adams many times after May, 1898, assured this plaintiff that he would become the owner of all his, the said C. W. Adams's estate. That this plaintiff having full implicit confidence in said C. W. Adams, that he would abide by his promise and agreement, took it for granted that the said C. W. Adams had made a will legally bequeathing and devising to this plaintiff his entire estate, or had in some other manner arranged for plaintiff becoming the owner of his estate. And this plaintiff further avers that it was not until after the death of the said C. W. Adams that he learned that no will or other conveyance made by said C. W. Adams could be found among his papers, and the said C. W. Adams died intestate, although he fully performed on his part all the agreements made by him as stated herein, yet the said C. W. Adams failed to carry out and comply with his promises and agreements as heretofore stated.

"Plaintiff further states that the said C. W. Adams, during his lifetime, always treated him with kindness and fatherly affection, and at various times bestowed gifts upon this plaintiff.

"Plaintiff further says that much of the services performed by him were of the character and nature that the same could not be measured by damages re-

covered in an action at law, and that he had no adequate remedy at law.

"That to deprive him of his rights and of the property and estate left by the said C. W. Adams would be a gross fraud and a great hardship on this plaintiff, and that in equity and good conscience he is entitled to all of the estate and property of the said C. W. Adams, deceased, after all his just debts, costs and expenses are paid.

"Plaintiff further states that the defendants refuse and fail to recognize his legal rights to the property and estate of said C. W. Adams and threaten to turn over said estate to those entitled to the same according to the laws of the State of Missouri, as soon as his administratorship ends; and plaintiff further states that he does not know the exact value of the said C. W. Adams's estate, but the same is worth more than $50,000.

"Wherefore, the plaintiff prays that a decree be herein entered establishing his exclusive right to and ownership of the entire estate left by the said C. W. Adams at the time of his death, and all increase of the same since his death, after deducting all debts owing by the said estate and the costs and expenses connected with the administratorship of the same. And that a decree be entered in favor of the plaintiff specifically enforcing the agreement made by said C. W. Adams with this plaintiff as stated in plaintiff's petition, and that all title, legal and equitable, to said estate, real or personal, be divested out of the defendants, and each of them, and invested in this plaintiff, and for all other and such further relief as the facts herein stated may warrant and the court deem proper."

The averments in the petition in respect to this contract and the performance of it, were directly put in issue by the answer of the administrator of the

estate of Dr. Adams, as well as by the answer of the sister and brother of the half-blood of the doctor.

The plaintiff in this case in 1897 was a young physician, residing with his mother and stepfather and brothers in Kansas City, Missouri, He had opened an office in the Rialto building and had some practice, in fact, Dr. Anderson says that he had a good practice. Dr. C. W. Adams, with whom it is alleged this contract was made, was a bachelor, with no next of kin except his half-sister and half-brother, who have filed an answer in this cause.

Dr. Adams was educated as a physician. and in the line of his profession was regarded by many as one of the ablest physicians and surgeons in the West. In 1890 he became dean of the University Medical College of Kansas City and retained that position until about six months before his death, which occurred in August, 1899. He was an eccentric and peculiar man in his disposition and became addicted to the use of intoxicating stimulants and this habit grew upon him until doubtless it had a great deal to do with his death. He loved the companionship and association of young men and particularly students of the university of which he was dean. In 1897 a partnership was formed between Dr. Adams, the plaintiff, Dr. Rosenwald, and Dr. H. C. Anderson. This partnership continued until 1899. From eight to ten elegant rooms were furnished by Dr. Adams in the Ridge building to be occupied by this medical firm.

The mother of the plaintiff, Mrs. Stern, testified that Dr. Adams, prior to the establishment of the offices in the Ridge building, was a frequent visitor at her home. She relates conversations with the doctor in connection with the plan of forming a partnership and moving into the Ridge building, and speaks of the great admiration that Dr. Adams had for her son, and she asked him what he wanted with him and she says that the doctor replied that he wanted my son to come .

to him and be his son, to comfort him and nurse him and take care of him and be with him always. She says that the doctor further stated that her son could step into his shoes when he died and that he wanted somebody to comfort him and nurse him. At another conversation she says that the doctor told her that if she would let Leon (that was the plaintiff) go and be his son from now and ever after, he would do a father's part by him and take care of him now and ever after, until death do us part. She also stated that the doctor told her that all he possessed in the world is Leon's now and whatever he accumulated during life would also be his. At first Mrs. Stern testifies that she refused to consent to let her son go with Dr. Adams, but finally to gratify the wishes of her son and at the request of her husband and other son she thought for a young professional it was a great step toward advancement, and she gives that as her reason why she finally consented to her son going with the doctor. During these conversations the mother of the plaintiff suggested to the doctor the propriety of putting this agreement in black and white; he suggested in response to her suggestion that that was another evidence of a distrustful woman, and remarked to her, "why should you want it in black and white?" and she replied, "Because you may die," and the doctor replied, "I won't die; besides my word is like my oath taken on a stack of Bibles."

The inconsistency of the doctor in these conversations will be noted, in this, that in one of the conversations the doctor was wanting her son to be with him for the reason that he was not well and remarked to Mrs. Stern that the plaintiff would step into his footsteps when he died, and he expressed some apprehension about dying, but when there was an effort to have this alleged agreement reduced to writing, the doctor just simply remarked, "I won't die."

Mrs. Stern further stated that her son left her

home to go with Dr. Adams to live there with him, take his meals with him, sleep in the same house with him and simply take the part of a son. She further says, in speaking of her authority, that her son was under her authority until he was twenty-one and was also under her care after he became twenty-one and further remarked that "I suppose he will be as long as he lives, to a certain extent, under my authority." She testified to numerous other occasions in respect to the relations existing between her son and Dr. Adams and her son's kindness and attention to Dr. Adams, but there is no necessity of reproducing in full her testimony.

Dr. Anderson, a member of the firm of Adams, Rosenwald & Anderson, testified in this case. He substantially stated that the agreement was that Dr. Rosenwald should be the physician and the companion to Dr. Adams, to look after his personal wants, to take care of him and in consideration therefor Adams was to leave everything to Rosenwald upon his death. As to the partnership arrangement, he says all the moneys collected were to be turned over to Dr. Rosenwald; he paid all the expenses; if there was not enough taken in during the month to cover all the expenses, Dr. Adams made the balance good with his own check. He detailed the intimate and confidential relation that existed between Dr. Adams and the plaintiff. He says that Dr. Rosenwald prescribed for Dr. Adams as a physician; that he was his companion, looked after his personal wants; advised him in a business way and was his confidant in business matters. He further states that Dr. Adams during the partnership was continually trying to turn over the practice and his patients to Dr. Rosenwald, if they would accept him, and that he had repeatedly heard Dr. Adams refer to Rosenwald as "Leon" and "Leon, my son" and referred to him as "his best friend, his truest friend," and that Leon was everything to him. He says that

Dr. Rosenwald attended to Dr. Adams's correspondence and looked after the business generally; the rent of the eight or ten rooms occupied as the offices of this firm was to be paid out of the money collected and turned over to Dr. Rosenwald; the furniture of the offices was all paid for by Dr. Adams. This witness further testified that about a week before the death of Dr. Adams he gave Dr. Rosenwald his library. He also relates a number of conversations between himself and Dr. Adams in relation to Dr. Rosenwald and what he intended to do for him, etc.

Dr. N. P. Hansen, who said he lived with Dr. Adams and Dr. Rosenwald at their offices in the Ridge building, testified in this case, and his testimony relates to conversations had with Dr. Adams in relation to the plaintiff and that Dr. Adams remarked that "his son was to get his property when he died;" and pointed out Dr. Rosenwald when he stepped into the room, as being the man he was talking about, and that Dr. Adams said that he and plaintiff had an agreement whereby he should take care of him, "as he does now, until I die, and then when I die he takes possession of everything I got; we have agreed on that long ago." He further remarked that "he thought most of the students knew it." This witness further testified to the kind and courteous treatment of Dr. Adams by the plaintiff and compared it to the treatment similar to that of a father to his son, and that he had often heard Dr. Adams refer to him as "his son."

Dr. E. T. Pendleton, who was a student in the University Medical College of which Dr. Adams was dean, testified in this cause. He slept at the offices in the Ridge building of Adams, Rosenwald & Anderson. He relates a statement made by Dr. Adams to him in which he says that Dr. Adams told him that he had agreed with Dr. Rosenwald that Rosenwald was to give up his practice and offices in the Rialto building and look after his business, personal wants and all of his desires, and

correspondence, in consideration for this, he was to receive his entire estate, whatever he had left at the time of his death. The witness says that he heard him make this statement more than once. He further states that in speaking of Dr. Rosenwald, he would call him his son Leon, and usually quoted the scriptural passage, "This is my beloved son in whom I am well pleased." He then detailed the attention given by Dr. Rosenwald to Dr. Adams, and the fact that he would accompany him to his meals, usually; he further testified that Dr. Adams wanted to retire from the practice of medicine and was trying to turn over his practice to Dr. Rosenwald.

Dr. I. J. Wolf was also a witness in this case. He also testified as to conversations with Dr. Adams in respect to the disposition of his property; he heard him say on one occasion that "Leon," meaning the plaintiff, "need not care what the medical profession thought of him," that if he would stick to him and care for him as he agreed to do, "I will do my part of the agreement and leave him all my property as well as my practice." That he heard Dr. Adams at different times drop the remark that everything that he had belonged to Dr. Rosenwald or would belong to him after his death. He then detailed, as the other witnesses, the confidential relation that existed between the plaintiff and Dr. Adams.

William Abel, another witness, was introduced by the plaintiff. He knew Dr. Adams intimately for eighteen or twenty years; he says that Dr. Adams brought Dr. Rosenwald in and introduced him to him as "his boy," and "his son," and Dr. Adams further stated to him that he is going to be my son; that he had adopted him, and that Dr. Rosenwald had agreed to take care of him as long as he lived and in return he agreed to turn over his practice and all of his property at his death.

Mrs. William Abel, another witness, said that she

had heard Dr. Adams say that he and Dr. Rosenwald had made an agreement; that Dr. Rosenwald was to take charge of him while he lived; take care of his business and assist him in his business in every way he could and that when he died he would leave the business and whatever he had to Dr. Rosenwald for what he had done for him.

Mrs. W. C. Hunt, a witness for the plaintiff, testified as to conversations with Dr. Adams in which Dr. Adams spoke of an agreement with Dr. Adams that, if Dr. Rosenwald would come over and take care of him as long as he lived and be his companion, at his death Dr. Rosenwald should have everything.

Dr. H. T. Jones, also a witness on behalf of plaintiff, was a student at the University Medical College and lived in the Ridge building in the offices of Adams, Rosenwald & Anderson from 1897 to 1899. He relates a number of conversations with Dr. Adams, saying that the doctor always referred to the plaintiff as "his boy," "his son," and showed every affection for him and that the doctor stated that he was going to adopt him and that Dr. Rosenwald was to inherit his estate and all of his property. This witness made the further statement that he heard Dr. Adams make statements about his will; that he was going to leave his property to Dr. Rosenwald, but in addition spoke of the close relations between Dr. Adams and Dr. Rosenwald, and that it seemed to be closer than a mere partnership.

Margaret May Upham was another witness. She was confined in the University Medical Hospital under the care of Dr. Adams, and detailed a number of conversations she had with him in which she spoke of the great admiration that Dr. Adams had for the plaintiff, and that the doctor stated that he wished that he could adopt him and have him for his own son, and then after Dr. Adams and Dr. Rosenwald were located in the Ridge building, Dr. Adams told me that they did live as father and son and Dr. Rosenwald waited on him,

looked out for his interests; as he expressed it, he said "he is the best boy that ever was, and in return I expect I'll be as a father to him, and when I am gone he gets my estate." In speaking of an agreement this witness said that it was agreed that Rosenwald should take care of Dr. Adams and his books and look out for his interests; that Dr. Adams was growing old and might say feeble, too, for his health was failing; Dr. Rosenwald was to step in and take his patients and his business and in return for that Dr. Adams expected to leave everything that he had to Dr. Rosenwald. This witness further detailed her observations of the kind treatment of Dr. Rosenwald to Dr. Adams; his attention to him and the looking after his interests and wants.

Dr. H. Thomas Willis, another witness, testified in relation to a trip that he made with Dr. Adams to Rochester, when the remains of Dr. J. W. Adams were buried; this trip was taken June 8, 1897. He details some conversation with Dr. Adams in which the doctor spoke of the adoption of Dr. Rosenwald, the plaintiff, and Dr. Adams in that conversation expressed some doubt as to whether an adoption could legally be made; stated that he had found out some way that an adoption would not be legal and Dr. Rosenwald would get his estate without an adoption. This witness further stated that it was on this trip that Dr. Adams told him that he did not care to die as his father died, the lonely conditions, etc., and it was then when he told him of the arrangements between him and Dr. Rosenwald. His testimony further relates to his physical condition; his bad health, being affected with some pulmonary trouble.

Mrs. Mary Roberts also testified as to conversations with Dr. Adams in his lifetime similar to those of a number of other witnesses in this case. She said that the doctor in one of the conversations spoke of being very sick last night and that he would have died

if it had not been for Leon, meaning the plaintiff; and stated that it was nice to have him, and then remarked that "Leon knows that he will be well paid at my death." She further stated that the doctor at some of the conversations told her of the kindness of the plaintiff, and said he could afford to be good to him because he knew he would get his money.

J. A. Rose, a witness for plaintiff, testified in relation to a transaction about some property he had leased that belonged to Dr. Adams and about some repairs or improvements and that Dr. Adams in relation to this transaction referred him to Dr. Rosenwald and said that he had charge of it, and that it would all be his some day anyhow, and just referred him to the plaintiff.

There were other witnesses who testified to conversations with Dr. Adams in which he said that "what I leave goes to Dr. Rosenwald."

Witness J. C. Sporleder testified that Dr. Adams was his family physician and had been for a number of years, and that he called to see him one day, and that Dr. Adams directed him to go to the office and see his son, and he asked the Doctor who his son was, and he said "Dr. Rosenwald." So the witness went up in the new Ridge building that afternoon and saw Dr. Rosenwald and told him that Dr. Adams had sent him up for treatment.

There were a number of other witnesses that testified as to conversations with Dr. Adams of similar import to those that have herein been referred to, and of the courteous treatment and kindness of the plaintiff to Dr. Adams when they were in partnership in the offices in the Ridge building.

It is further disclosed by the record that the rooms occupied by the firm of Adams, Rosenwald & Anderson were very expensively furnished and that Dr. Adams paid for the furniture. Mrs. Lunt, the housekeeper, testified that the firm had ten rooms in the Ridge build-

ing, nine on the second floor and one of them on the fifth; three of them were used for sleeping rooms; there was a Japanese, an oriental and operating room, and then what was called the bumming room. She said that she was called by all of them, "the kid," Dr. Rosenwald was called "Uncle Leon," Dr. Adams, "Daddy," and Dr. Anderson, "Uncle Claude." These rooms were afterwards, it seems, reduced to six and a closet.

Mr. Ridge, one of the witnesses, said he went in there frequently; it was a genial, nice place to go to, "and in the bull pen, as we termed it back there, there was always a half dozen or more. Sometimes I would go there in the afternoon three or four times in the week to play penuchle with some of the boys."

It was further developed at the trial that Dr. Adams had made propositions as to an agreement, similar to the one alleged to have been made with Dr. Rosenwald, with Dr. Chase and Dr. Sulzbacher. These propositions were made, according to the statements of the witnesses, in 1892 and 1893. In 1897 and 1898, and up to the time that Dr. Adams died, he used intoxicants to a great excess. One of the witnesses, Albert Dorschuk, says that he took fluid extract of cocoa, which is the same as cocaine, took hasheesh and also frequently took belladonna and sometimes opium. This witness, in speaking of the effect that these drugs had on Dr. Adams, stated that they made him very beneficent; "he would make great promises to all of his friends while under the influence of these drugs and under the influence of liquor." This witness, in explaining his meaning, said, "I mean that he promised one man this and another that, he promised me—he said to me one morning, if you need a thousand dollars come right up, I will give it to you; if you need ten thousand dollars come up, I will give it to you."

Mrs. W. C. Lunt, the housekeeper, testified further, that upon the opening of the Cuban War, Dr. Adams was trying to get Dr. Rosenwald to go with him to the

war, and that Dr. Adams suggested that they go right over to Mr. Middlebrook, one of the defendants in this case, and that he, Dr. Adams, would make his will leaving everything to Dr. Rosenwald and Dr. Rosenwald said, "All right," and he got his hat and said, "I will go with you and make my will and leave you everything," and they left and went out.  Mr. Middlebrook testifies as to what occurred at the office, when they came down with a view of executing mutual wills.  Dr. Rosenwald's will was written first.  He said to Mr. Middlebrook that they were going to the army together and said that they were going to settle their affairs before they left, and then proceeded to make out the will.  Dr. Adams did not execute any will, nor suggest the execution of any will in the office.  Mr. Middlebrook, in answer to the following questions, details just about what occurred:

"Q.  What reason was given, if any, by Dr. Adams, why he didn't make out his will?  A.  I don't think he gave what you might call a reason.  He just didn't make it out, that's all there was about it, and all three of us passed over the situation as easily as we would.  I never did understand why he did not make it out.

"Q.  Now, in detailing to you the arrangement between them when they called on you, can you state the language that was used by Dr. Rosenwald as to the arrangement or the substance of it, in the presence of Dr. Adams?  A.  I can't detail the language exactly, I think I can detail the substance, although that's pretty hard to do because so many things have happened since— various things connected with it.  My best recollection is that they came together into the office along about the time of the commencement of the war with Spain. They came in and sat down and after some usual pleasantries between us, Dr. Rosenwald made the statement to me that they were going to this war together; that they didn't know what would become of them, whether they would live through it, and that they wanted their

affairs settled, and were going to make their wills. I will not be positive, but to my best recollection, as a matter of politeness and deference to Dr. Adams, I think that Dr. Rosenwald in some proper manner, either by his demeanor or his expressed words, indicated that Dr. Adams would go ahead and make his will. But the doctor, not apparently being ready, or for some reason or other not taking the initiative, Dr. Rosenwald had me make out his first. When his was completed and witnessed, the thing came to a termination right there. Now, as to what Dr. Adams said, his language, I can't tell. The fact of the matter is, I don't think he said very much; at all events he didn't ask me to make his will.

"Q. Now, Mr. Middlebrook, what was said, if anything, as to whom Dr. Adams was going to leave his estate, either by Dr. Rosenwald or by Dr. Adams, at the time they were there together? A. Well, this occurrence, this conversation, was of the character I have detailed, and about leaving the estate, I can't recall that part of it. The only thing that I can recollect is that the statement that was made to me when they came in by Dr. Rosenwald was, that they were going to make their wills in favor of each other. Possibly the words about leaving all the property may have been used, but I don't recall them if they were. As I recollect it, it was to leave a will, each one in favor of the other, according to Dr. Rosenwald's statement."

It is also disclosed by the record that after the death of Dr. Adams and about the time the administrator was making an inventory of his estate, the plaintiff made no claim, so far as was disclosed by what he said, to any part of the estate, except the library and perhaps the surgical instruments. The testimony as to what occurred at that time is about as follows:

Mr. Seehorn, a lawyer, one of the appraisers of Dr. Adams, appointed by the court, says when he went

to appraise the personal property, he found plaintiff at the office.

"Q. Well, now, what did he say or did he make any claim to anything? A. Well, the doctor told us that he could not stay until we got through with the inventory, and made claim to the library.

"Q. Made claim to the library? A. Yes.

"Q. What did he say? A. He said that the doctor had given him the library, as I remember it.

"Q. Did he request you not to appraise it, or what? A. Well, we consulted with Mr. Middlebrook and concluded not to appraise it after he had made the claim.

"Q. Did you appraise the rest of the stuff? A. Yes.

"Q. Did he claim anything else but that? A. I believe there were some instruments there, but I am not sure about that.

"Q. Well, anything else besides the instruments then? A. No, sir; no, sir.

"Q. Were you present there at the time you all went up to have the estate appraised? A. Yes.

"Q. What claim did this plaintiff here make to the personal property in the office at that time? A. When we went in to appraise the library he said that Dr. Adams had given him the library and we need not appraise that.

"Q. Did he claim anything else in there? A. No, sir.

"Q. And so you did leave it out, did you? A. Yes; after Dr. Anderson had come there and assured us to the same effect, we left it out."

There were also introduced in evidence the pleadings in another suit by plaintiff against this estate. There are two counts in the petition; the first count contains substantially the same allegations as are contained in the petition in the suit at bar, except in the

prayer for relief. The second count is an action for the value of services performed by Dr. Rosenwald during his lifetime, in which he claims fifty thousand dollars.

The testimony introduced at the trial of this case is very voluminous; it contains a volume. The reasonable limits of this opinion prevent us from undertaking to detail or reproduce the evidence in full. We must be content with a mere reference to the nature and character of the testimony introduced. However, we will say to counsel both for appellant and defendant that, this case being one of great importance, we have read in detail all of the testimony introduced at the trial, and while we have only mentioned a very small part of it, and in fact none of the cross-examination by the defendants' counsel, it by no means should be taken as an indication that we have ignored the large volume of testimony introduced in the case. A summary of the testimony introduced may thus be briefly stated:

Dr. Rosenwald, the plaintiff, resided with his mother and stepfather in Kansas City, Missouri; had a very pleasant home and also had entered upon the practice of his profession, by opening offices in the Rialto building. Dr. Adams, though very eccentric, was one of the brightest and ablest physicians and surgeons in that section of the country. Numerous witnesses detail conversations with Dr. Adams in which it is indicated that a contract was made with the plaintiff that he should give up his offices in the Rialto building and form a partnership with Dr. Adams with offices in the Ridge building; and take care of, look after the business and wants of Dr. Adams, and in consideration of this that he would leave him his entire estate.

The witnesses also testify as to the intimate, close relations existing between the plaintiff and Dr. Adams in his lifetime and of their admiration for each other, and the courtesies shown one to the other in their daily lives. Dr. Adams furnished a number of rooms in the

Ridge building with very expensive furniture and Dr. Rosenwald, the plaintiff, was a member of the firm and had charge of the business of the firm; managed the finances and also engaged in the practice. That Dr. Adams and Dr. Rosenwald, the plaintiff, were warm, personal friends and very kind to each other, there can be no dispute from the testimony.

The parties to this alleged contract, Dr. Rosenwald and Dr. Adams, were both not only intelligent, but regarded as good physicians; they, above all others, were presumed to know the uncertainty of life, yet there is an absence in this record of anything which preserves any satisfactory evidence of such an important contract as is sought to be specifically performed in this case; nor does the record disclose any reason for the failure to preserve it, and the trial court was left to the ascertainment of the existence of such a contract or agreement to numerous conversations and admissions detailed by the witnesses, according to their best memory. This, with the reference to the facts as contained in the opinion of the trial court, is a sufficient statement to enable us to determine the correctness or incorrectness of the conclusions reached by the chancellor in the disposition of this cause. Upon the submission of this cause to the court its conclusions were announced in a written opinion as follows:

"This is a suit wherein the plaintiff seeks to recover all the property of Dr. C. W. Adams, deceased, basing his claim therefor on an alleged oral contract made with the deceased to the effect that if plaintiff would give up his home and come and live with the deceased and be a son to him and take care of him while he lived, the deceased would give plaintiff all his property at his death. There is no doubt that in this State equity will sustain an action of this description and that such a promise, though not clothed in technical or precise terms, would be sufficient, the other party having performed his part of the contract. It is equally

true under the decisions that the 'proof of the agreement should be of so clear and forcible a nature as to leave no room for reasonable doubt in the mind of the chancellor  . . .  and there must be like proof that the acts refer to and result from that agreement and are such as would not have been done unless on account of that very agreement and with a direct view to its performance.'

"At the close of the trial of the cause, when every fact and circumstance in evidence was fresh and clear in my mind, I was in doubt as to whether the contract alleged between plaintiff and deceased had been established. After mature deliberation on all the facts and circumstances involved this doubt has increased. It is true plaintiff's mother testified clearly and positively to a conversation between herself and the deceased, in which the latter said he wanted to adopt plaintiff, have him leave his home and live with the deceased as his son, and that he would leave the plaintiff his property. But she also testified that the deceased, when requested by her to put that promise in writing, refused to do so.

"It is also in evidence that plaintiff and deceased were to make mutual wills, and that they went to Mr. Middlebrook's office for this purpose, and that plaintiff made his will, but the deceased did not. Although they had gone there for that purpose, and although plaintiff there had Mr. Middlebrook write his will, nothing was done further about writing the deceased's will. It was not even suggested there that the deceased make his will as plaintiff had already done, and both left Middlebrook's office without a word as to why the deceased had not made his will, though both had gone there for that very purpose. True this was the year after the contract is alleged to have been made, and at this time they had been partners working and living together for many months. Deceased believed all this time that plaintiff could not get his property without a will, or a deed, for the deceased bore the same relation to Dr.

Adams, Senior, as did plaintiff to the deceased, and yet
the latter had Dr. Adams, Sr., not only make a will in
his favor, but also a deed to him. Besides the deceased
believed when Dr. Adams, Sr., took him to be a son, a
formal deed of adoption would not be valid, he (the de-
ceased) being then over twenty-one years of age.
Plaintiff was over twenty-one when the deceased and
plaintiff established the relations between themselves,
and the deceased knew this, then why, if he intended
that plaintiff should at his death receive all his prop-
erty, did he not put the agreement in writing, or at least
sometime during their relations make his will in plain-
tiff's favor; especially, why did he not make his will
at the time it is said they went to Middlebrook's office
to make their mutual wills?

"Much evidence from reputable and truthful cit-
izens was introduced to show that plaintiff and de-
ceased were exceedingly intimate; that deceased re-
ferred to plaintiff as 'his boy,' 'his son,' and fre-
quently spoke of the plaintiff in the most affectionate
way; but the evidence also shows that even before the
deceased knew plaintiff, as well as after their intimacy
began, the deceased always had with him and around
him favorite students of the medical college of which
he was an officer, and that he at times referred to them
as his boys. True, the relationship was not as close
and as intimate between the deceased and these other
students as it was between him and the plaintiff, but
that was natural and to be expected. Deceased was a
brilliant man, had a fine practice, was suffering from
an incurable disease which was aggravated by the use
of drugs, and he realized that he must soon abandon his
profession. He selected plaintiff from his friends
among the students as his partner, fitted up expensive
offices, diverted to plaintiff all his practice that he
could control, paid all expenses over the receipts of the
office, and in many ways exhibited a special interest in
and affection for the plaintiff. During the last few

months of his life the evidence shows that some differences arose between him and the plaintiff, but these were being healed over. It further appears, however, that just before his death, the partnership was dissolved, the deceased packed and stored practically all his furniture, gave his valuable library to plaintiff, and was preparing to go South; his disease had become more aggravated; he was preparing for a trip from which he certainly knew he might not return, and yet, without the scratch of a pen, the utterance of a syllable confirmative of the contract it is alleged he made with plaintiff two years before, he removed his personal property from the custody and care of him who it is alleged was to be the heir, and in a very short time thereafter died.

"I do not attempt here to recite the whole testimony in the case. There was much of both positive and circumstantial character tending to prove the main question, as to whether or not there was a contract as alleged by plaintiff. Enough has been said, however, to indicate that in my opinion the plaintiff has failed to establish the contract alleged, and therefore the finding will be for the defendant."

Judgment was rendered in accordance with the conclusions reached in this cause; from this judgment plaintiff, in due time and proper form, prosecuted his appeal to this court and the cause is now presented to us for consideration.

## OPINION.

The record in this cause presents but one question, which is embraced in the challenge by plaintiff of the correctness of the conclusions reached by the chancellor in denying the relief sought by the plaintiff and the dismissal of the bill. Plaintiff seeks by this action to have a court of equity specifically perform a contract made with the defendants' intestate, during his lifetime,

which embraces the disposition of the entire estate of
the deceased at the time of his death—in other words,
it is claimed by plaintiff that during the lifetime of Dr.
C. W. Adams, in consideration of certain acts and ser-
vices, to be performed by the plaintiff (which it is al-
leged were performed), Dr. Adams was to leave
his entire estate to him. It is conceded that no evidence
of the contract alleged in the petition was preserved by
any writing in any form, and the proof of its existence
rests entirely upon parol testimony. The mere state-
ment of the proposition involved in this controversy
indicates the strict rule which should and will be ap-
plied in the treatment of the question presented.

The proposition which is presented upon the record
before us is not a new one in this State; it has fre-
quently had the attention of the appellate courts and
the rules announced as to the nature, character and
force of the testimony necessary to obtain the relief
sought in cases of this character, are no longer in
doubt. The rule is nowhere better and more correctly
stated than in the recent case of Kinney v. Murray, 170
Mo. 674. The law upon the subject was thus clearly
announced: "A court of equity in this State will spec-
ifically enforce an oral contract to make a will in a
particular manner, where a valuable consideration has
been received for the promise and a fraud would be
perpetrated upon the promisee or beneficiary unless
the contract be performed. But, the proof of such a
contract must be so cogent, clear and forcible as to
leave no reasonable doubt in the mind of the chancellor
as to its terms and character; and where the considera-
tion consists of acts to be performed, there must be
like proof that the acts performed refer to and result
from that contract, and are such as would not have
been done unless on account of that very agreement and
with a direct view to its performance. 'There must be
no equivocation or uncertainty in the case.' This doc-
trine is established and its application illustrated in a

long line of cases." During the course of the opinion in the case cited, it was also very appropriately said, doubtless to emphasize the importance of the duty of the chancellor and the necessity of a strict adherence to the rule announced in the trial of cases of this character, that, "When, as in this case, and in consonance with this doctrine, a court of equity is called upon to establish and enforce a contract of this character, in the teeth of the Statute of Wills, and of the Statute of Frauds and Perjuries, and to set aside the disposition of valuable property made in conformity with the requirements of those statutes, there is devolved upon the chancellor the gravest responsibility, perhaps, that ever attaches to his high office. And nothing short of the inherent justice of the claim, supported by evidence that can be relied upon with the utmost confidence, proving the existence of the contract, its terms and conditions and a substantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt, can ever justify the exercise of such an extraordinary prerogative."

No less strict rule would be in accord with the proper administration of justice and well-settled principles of equitable jurisprudence. The strict enforcement of the doctrine announced, as to the character of proof essentially necessary to obtain the relief sought in suits of this kind, is one of the most important and valuable safeguards surrounding land titles and the permanency of ownership of property by the citizens of this State.

This leads us to the analysis of this rule as applicable to the proof made in this case. In making this analysis it is important to keep in view the distinction made by Mr. Story (2 Story's Equity (13 Ed.), secs. 769,770); he says: "It is important to take notice of the distinction between the case of a plaintiff seeking specific performance in equity and the case of a defendant resisting such a performance. We have already

seen that the specific execution of a contract in equity is a matter, not of absolute right in the party, but of sound discretion in the courts. Hence it requires a much less strength of case on the part of a defendant to resist a bill to perform a contract, than it does on the part of the plaintiff to maintain a bill to enforce a specific performance. When the court simply refuses to specifically perform a contract, it leaves the party to his remedy at law. An agreement to be entitled to be carried into specific performance ought to be certain, fair and just in all its parts.''

In order to have justified the chancellor in this case in decreeing a specific performance of this contract, it was absolutely essential that it should first be made to appear to him that the contract was in fact made, by proof so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor of its terms and character. Second, it was equally essential to show that such contract was made upon a valuable consideration and that a fraud would be perpetrated upon the plaintiff unless the contract be performed. Third, upon the allegations in the petition, the consideration of the contract sought to be enforced was predicated upon the acts to be performed by the plaintiff and therefore it was essential that the proof should satisfy the chancellor that the acts performed referred to and resulted from that contract, and were such acts as would not have been done unless on account of the very contract made and with a direct view to its performance.

Applying the testimony to the first essential, that this contract was in fact entered into, it may be conceded that there is some testimony indicating that a contract had been made, but is it of that clear, cogent and convincing character that ordinarily surrounds the making of a contract in the disposition of a large and valuable estate?

We have read in detail all of the testimony in this

case, both in chief and upon cross-examination, and it is apparent that the proof rests almost exclusively up-  on the repetition by witnesses of declarations and admissions made by Dr. Adams, who is now dead. An examination of this record further discloses that there is an absence of such definiteness and clearness as to the terms of the contract, as the law requires. We find some of the witnesses saying that Dr. Adams said that he had adopted the plaintiff; others stating that all of his property now belonged to the plaintiff; others stating that he intended to leave all of his property to the plaintiff at the time of his death. And as was ruled in the case of Grantham v. Gossett, 182 Mo. l. c. 671, "In cases of this character it will not satisfy the requirements of the law to show that there was an understanding of an indefinite character, leaving its terms more or less to inference." There must be no equivocation or doubt in the case. "When a plaintiff comes into court with a case of this kind, there should be no doubt in the pleadings or in the proof as to the contract."

Upon the second proposition, it is contended by appellant that the failure to perform the contract perpetrated a fraud upon the plaintiff. It is clear under the rule announced, that there may be a clear showing as to the contract, yet in maintaining the safeguards which should surround property rights, courts of equity may still refuse to specifically enforce it, even under the character of proof, unless it should appear that its failure to do so would operate a fraud upon the contracting plaintiff. We are unable to give our assent to the contention of the learned counsel for plaintiff in this cause, that the failure of the chancellor to specifically perform this contract perpetrates a fraud upon plaintiff. A careful consideration of all of the testimony disclosed by the record demonstrates that plaintiff, in removing from his offices in the Rialto building and

forming a partnership with Dr. Adams, was not sacrificing any of his business interests.

While it may be said, from a moral standpoint, that Dr. Adams did not measure up to the standard that would ordinarily be required in selecting a partner, and while the conduct of Dr. Adams subjected him to proper and just criticism, when the evidence is all considered there is no room for dispute that Dr. Adams was a man of extraordinary ability in the line of his profession, and just such a man, from a professional standpoint, as would advance the interests of a young practicing physician. This was the view taken of the situation by the mother of Dr. Rosenwald, Mrs. Stern. She at first refused to consent to the formation of a partnership, and, as she states, upon being urged by her husband that it was a great step toward advancement for a young professional, she finally consented to the formation of the partnership.

So far as concerns the contention that it was an abandonment of the plaintiff of his home, a separation from his family, we can not treat that subject seriously, for the testimony shows that the offices in the Ridge building were elegantly furnished; the plaintiff was a grown young man in the same city of the residence of his mother and a stepfather, with nothing to prevent him from associating with them as frequently as he desired. This was not going to a foreign land or to a distant place from the residence of his family, but in fact was the occupancy of magnificently furnished apartments, with ample opportunities to enjoy the pleasures and comforts of association with his mother, stepfather and his brothers. Here we have a young practicing physician, entering into a partnership with the head of the Medical University in Kansas City, and who had been its head for a number of years, and stood high in his profession, with elaborately furnished offices, with all the modern conveniences, and we are not willing to say that the formation of this partnership was any sac-

rifice of professional standing or business interests up-on the part of the plaintiff, and it is not so shown by the testimony when it is all fully considered.

Again the testimony introduced in this case does not convince us that the acts performed by the plaintiff for the deceased, Dr. Adams, after the formation of the partnership, were such as would not have been done had no contract existed for their performance. It is said by a number of witnesses that he attended to all of the correspondence, the business connected with the offices, looked after the wants of Dr. Adams, cared for him when indulging excessively in intoxicants; but were these acts anything out of the usual order, or which would not be expected to be performed by a young practicing physician who had entered into a partnership with an older physician of such marked ability and prestige? The conduct of the plaintiff toward Dr. Adams, as related by the witnesses, is nothing more than that course of conduct which good taste and propriety would suggest to any young practicing physician who had formed a partnership of this character. The proof in this case is absolutely insufficient to convince any chancellor that these acts, under the circumstances, would have remained unperformed had it not been for the contract which is sought to be enforced, and it is an essential element of the rule herein announced, as to the enforcement of contracts of the character in suit, that the testimony must satisfy the chancellor that the performance of the services was the result of the contract and were such as would not have been performed unless on account of an agreement in relation to their performance.

We think it is clear, when all the testimony is considered, in connection with the nature and character of the partnership formed, as well as the nature of the services performed by plaintiff, that his acts were nothing more than would have been done by any other young practicing physician similarly situated, and

their performance can be attributed to the discharge of a plain and simple duty, as a young, active member of the firm, as well as to their performance in pursuance to any sort of a contract or agreement.

As applicable to this proposition, this court in the case of Emmel v. Hayes, 102 Mo. l. c. 195, quoted approvingly Mr. Pomeroy's statement of the law (Pom. on Spec. Perf., p. 154), and the doctrine was thus announced by that learned author: " 'A plaintiff can not, in the face of the statute, prove a verbal contract by parol evidence, and then show that it had been partly performed. This course of proceeding would be a virtual repeal of the statute. He must first prove acts done by himself or on his behalf, which point unmistakably to a contract between himself and the defendant, which can not, in the ordinary course of human conduct, be accounted for in any other manner than as having been done in pursuance of a contract, and which would not have been done without an existing contract; and although these acts of part performance can not, of themselves, indicate all the terms of the agreement sought to be enforced, they must be consistent with it, and in conformity with its provisions when these shall have been shown by the subsequent parol evidence. It follows from this invariable rule, that acts which do not unmistakably point to a contract existing between the parties or which can be reasonably accounted for in some other manner than as having been done in pursuance of such a contract, do not constitute a part performance sufficient in any case to take it out of the operation of the statute, even though a verbal agreement has actually been made between the parties.' "

In Goodin v. Goodin, 172 Mo. l. c. 48, BRACE, J., speaking for the court, makes it manifest as to the showing necessary to be made before the chancellor, in order to warrant a judgment of specific performance. He said: "In order to sustain the defendant's claim

it devolved upon him to show a contract in clear, definite and unequivocal terms, with his father, to give or convey to him this particular piece of land, by evidence so cogent and satisfactory as to leave no room for reasonable doubt, and in like manner and by like evidence to satisfy the mind and conscience of the chancellor that the improvements made by him on the place were the result of such agreement, made in pursuance and on account thereof, and but for it they would not have been made, and that a refusal to enforce the contract would operate as a fraud upon the defendant." To the same effect is Williams v. Morris, 95 U. S. 457; Kinney v. Murray, supra.

Appellant places great stress upon the relations between the plaintiff and Dr. Adams, as detailed by the numerous witnesses in this cause, and insists that it is vital in the consideration of the other proof as to the contract or agreement. We will say upon that question that it is true that the record is full of statements by witnesses of fatherly and brotherly affection existing between these two men, yet it is equally true that the record shows that Dr. Adams was particularly fond of the students and former students of the university of which he was dean, and frequently addressed them in very affectionate terms. And it is disclosed that this plaintiff performed many kind acts toward Dr. Adams prior to any pretense that there was any agreement or contract for him to do them.

We must not lose sight of the main proposition in this case, that the evidence of the contract and its terms rests solely upon declarations made by the deceased, Dr. Adams. This character of testimony has never been looked upon with favor by this court. It was said by BLISS, J., in Johnson v. Quarles, 46 Mo. l. c. 427, that "evidence of such declarations, it is true, is admissible, but it never amounts to direct proof of the facts claimed to have been admitted by those declarations; and it is sometimes doubted whether it ought to be

received at all, when introduced for the purpose of divesting a title created by deed.'' This kind of evidence has always been received with great care, and when not supported by other evidence is generally entitled to but little weight. So it was said in Curd v. Brown, 148 Mo. l. c. 92, that ''evidence consisting of mere declarations or admissions of persons since dead, is entitled to small weight.''

The remarks of VALLIANT, J., in Steele v. Steele, 161 Mo. l. c. 575, might very appropriately be applied to a great deal of the testimony of the witnesses in this cause. He said: ''Giving to every particle of plaintiff's evidence full credence, it goes no further than to show that William Steele took the plaintiff into his family, reared him as a son, received from him a son's duty and from time to time made statements indicating that he intended to leave him his property at his death. But that he had ever bound himself so as to impair his own right to will his estate as he might thereafter see fit, there is not a word of evidence.''

Mr. Greenleaf, in his standard work upon the Law of Evidence, gives the key note to the origin of the disfavor entertained by the courts as to this class of evidence, wherein he says: ''When we reflect upon the inaccuracy of many witnesses in their original comprehension of a conversation; their extreme liability to mingle subsequent facts and occurrences with the original transactions, and the impossibility of recollecting the precise terms used by the party, or of translating them by exact equivalents, we must conclude there is no substantial reliance upon this class of testimony. The fact, too, that in the final trial of open questions of fact, both sides are largely supported by evidence of this character, in a majority of instances, must lead all cautious triers of fact greatly to distrust its reliability.''

The St. Louis Court of Appeals, in Reed v. Morgan, 100 Mo. App. l. c. 723, most emphatically con-

demns this character of testimony, and holds that "it is of limited probative force, and has been pronounced by eminent authorities dangerous and the most unreliable of all evidence, and should be received with great caution, and is only tolerated rather than favored by the courts."

To what has been said as to the unsatisfactory character of the testimony undertaking to establish this contract, may be added some few inconsistencies in the testimony itself. It is claimed by the numerous witnesses testifying in this cause, chiefly among them Dr. Anderson, who was a member of the firm of Adams, Rosenwald & Anderson, that Dr. Adams had contracted to leave all of his estate to the plaintiff, in consideration of the performance of certain services, yet we find Dr. Anderson testifying that about a week before the death of Dr. Adams he gave his library to the plaintiff, Dr. Rosenwald. If Dr. Rosenwald was then in possession of the offices and library, and has a contract that he was to have all of his property at his death, we see no reason why Dr. Adams should give him something that he had already agreed to give him. Dr. Anderson also testified that Dr. Adams gave him some chairs and book cases. He said frequently during his examination that he had heard Dr. Adams say that Rosenwald owned all of that property in that office, and he said that included the chairs given him, and that he was unable to explain how Dr. Adams could give him the property.

It is conceded in this case that Dr. Adams never made any will, yet we find Mrs. Lunt testifying that Dr. Adams told her that he had made a will.

We have in this case the further fact that Mrs. Stern suggested to Dr. Adams that the understanding or agreement should be put in black and white; that he declined to do so, and said: "I won't die, and my word is as good as my bond." Just previous to that he had said he was not feeling well and spoke about wanting Dr. Rosenwald with him, and that he might

step into his footsteps when he died. We have the further fact that, when the witnesses claimed that Dr. Adams and Dr. Rosenwald went down to Mr. Middlebrook's office to make mutual wills, so far as Dr. Adams was concerned, there was no will made, and if the contract as alleged existed, and they went to the office of Mr. Middlebrook to fully consummate it by executing mutual wills, the silence of Dr. Rosenwald upon the failure of Dr. Adams to execute his will, or give any reason for such failure, becomes significant.

The contract in suit, if made, was not a matter of mere sentiment, but must be treated as a purely business transaction, and Dr. Rosenwald's failure to urge, in the presence of Mr. Middlebrook, the execution by Dr. Adams of the evidence of so important a contract, which, according to the witnesses they had gone there for the purpose of executing, is to say the least a damaging circumstance against the plaintiff, tending to show that no such prior contract was recognized as existing between these two men, and the chancellor was warranted in taking such circumstances into consideration.

Appellant contends that the mere absence of any written contract is not to be considered as furnishing any reason for a doubt in the mind of the chancellor as to the existence of an oral contract. That is true, but in this case, under the circumstances and conditions surrounding the formation of the partnership and the making of the contract alleged to have been made by the plaintiff, the absence of any valid reason why the evidence of this contract was not preserved, is a fact that may be very properly considered. The condition of Dr. Adams's health, the value of his estate, the importance of the transactions, the fact that he had discussed with Dr. Willis the question of the legality or illegality of an adoption, furnish very strong reasons why two men, both physicians, one of them suffering from an incurable disease, consumption, should at

least have preserved some evidence of so important a contract as the one sought to be enforced by this suit. Hence, we say, that while the mere fact of the absence of a written contract is not a matter for consideration in the disposition of this case, yet the chancellor has the right, in connection with all the testimony, to consider the absence of any reasons why there was not some effort made to preserve the evidence of such contract.

If the condition of Dr. Adams, in respect to health, was as related by the witnesses, and as recognized by himself, no one knew such condition any better than plaintiff, and it furnishes strong reasons why this contract should have been reduced to writing. And there is a total absence in the record before us of any reasons why it was not. When we consider "that nothing short of the inherent justice of the claim of plaintiff, supported by evidence that can be relied upon with the utmost confidence, proof of the existence of the contract, its terms and conditions, and supported by a meritorious compliance therewith," entitle him to the relief sought, we are unwilling to say that the conclusions of the chancellor in this cause were erroneous.

We deem it unnecessary to further discuss the correctness of the rule applicable to this case, or to defend the reasons upon which it is based. There is but one expression by this court, and that has been uniform, and it is that the rule with all of its strictness should be applied to cases of this character.

Other jurisdictions look with the same favor upon the application of this just rule in the administration of equitable jurisprudence. In the case of Dalzell v. Dueber Mfg. Co., 149 U. S. 315, Mr. Justice GRAY adds his testimony to the correctness of this doctrine. He says: "From the time of Lord HARDWICKE, it has been the established rule that a court of chancery will not decree specific performance, unless the agreement is 'certain, fair and just in all its parts.' [Buxton v. Lister, 3 Atk. 383, 385; Underwood v. Hitchcox, 1 Ves. Sen. 279;

Franks v. Martin, 1 Eden 309, 323.] And the rule has been repeatedly affirmed and acted on by this court. In Colson v. Thompson, Mr. Justice WASHINGTON, speaking for the court, said: 'The contract which is sought to be specifically executed ought not only to be proved, but the terms of it should be so precise as that neither party could reasonably misunderstand them. If the contract be vague or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy.' [2 Wheat. 336, 341.] So this court has said that chancery will not decree specific performance, 'if it be doubtful whether an agreement has been concluded, or is a mere negotiation,' nor 'unless the proof is clear and satisfactory, both as to the existence of the agreement and as to its terms.' "

In Stiles v. Cain, 134 Cal. 170, the Supreme Court of that State thus indicates its conception of the rule applicable to specific performance of contracts: "There are contracts which are perfectly valid, and which a court of equity would not set aside for fraud, mistake, or for any unfairness, but which nevertheless, are so unfair that specific performance will not be decreed. This has always been the rule with courts of equity. They will not aid in the enforcement of a harsh and unjust contract, even though it be valid." To the same effect is the case of Drake v. Lanning, 49 N. J. Eq. 459. In discussing contracts of this character, it is said: "I can conceive of no ground upon reason or upon principle, and can find no authority for any exception in this respect, in favor of this class of contracts. On the contrary, it seems to me that this fundamental rule should be observed and enforced with greater, rather than less, rigor in such cases. To relax it would be to open the door to the proving and establishing of wills made by parol and in contradiction, it may be, of a written will executed with all the statutory formalities."

It is said by learned counsel for appellant in this case, that the half-sister and half-brother of Dr. Adams, who are to be benefited by this estate, had no communication with him for over twenty years;. that he had ignored them and there was no affection on the part of Dr. Adams for them. This may be true, but it furnishes no reason for the enforcement of this alleged contract, and is not a matter to be considered in the disposition of this cause. Rules in the administration of justice can not be made to meet the seeming demands of every particular case. If the facts in this case warrant the taking of this entire estate by the plaintiff as against the half-sister and half-brother, it would equally justify his action in enforcing this contract as against the children of Dr. Adams, if he had any at the time of his death—in other words, if plaintiff is entitled to have this contract specifically performed, he possesses that right against the world, and not especially against the parties to this action, who happen not to have been upon intimate social relations with Dr. Adams.

Counsel cite a number of cases in which this court has approved decrees enforcing specific performance of contracts, or disapproved the refusal of the trial court to enforce them. An examination of those cases will demonstrate that, not only satisfactory proof of the existence of the contract was made, but as well a full performance on the part of the party seeking its enforcement, and the additional essential was made manifest that a refusal to enforce the contract would result in the perpetration of a fraud upon the party who had fully performed the conditions of it. That is not this case. The testimony as applicable to this suit is not of that clear, cogent and undoubting character required by the law, either as to the contract itself, nor as to the performance of the services as a result of the agreement; nor does it appear that it would perpetrate

a fraud upon the plaintiff to refuse the specific enforcement of this contract.

It is well in this commercial age of our civilization for every citizen to understand that the courts of this country will not approve or encourage the absorption of entire estates of deceased persons upon contracts alleged to have been made with the deceased during his lifetime without clear and undoubting proof of every essential element of the contract as is required under our system of equitable jurisprudence.

When the inventory of this estate was being made by the administrator and the witnesses, this appellant only claimed that he was the owner of the library and perhaps the surgical instruments of Dr. Adams. While it may be said that it was not incumbent upon him to have made mention of his claim of the entire estate, yet, if this contract in fact existed, it was but natural, when making a claim to one part of the property, to have at least intimated his relation to that estate, and his failure becomes significant by reason of the fact that he waited for nearly two years before he asserted his claim to the entire property. If this contract can be specifically enforced upon the proof as made in the trial of this cause, then we confess that it furnishes strong reasons for alarm on the part of every citizen who has accumulated property, when he realizes the slender foundation upon which rest the rights of those who are entitled to it after his death.

This proceeding is simply an effort to distribute the estate of a deceased person different from that provided by law, by a contract resting on parol. Such efforts and the evidence relied upon to establish such contracts have uniformly been "looked upon with jealousy and should be weighed in the most scrupulous manner." [Woods v. Evans, 113 Ill. l. c. 191.]

It is unnecessary to pursue this subject further. This case was tried by the chancellor who presided over the court in the city where this contract was made, and

while in equity cases this court is not bound by the finding of facts as made by the trial court, yet it has repeatedly expressed its deference to such findings. The witnesses were all before the court and it had opportunities to determine their credibility and the weight of their testimony that is not afforded the appellate court, and after the patient hearing of all the testimony as disclosed by the record before us, it announced its conclusions as indicated by the opinion herein referred to. We are unwilling after a review of the entire record to say that the conclusions as reached by the chancellor in the trial of this cause were erroneous.

The judgment upon the testimony as shown by the record was right, and it is ordered affirmed.

All concur.