MAGGIE KIRK, Trustee for EUGENE JOSEPH KIRK, Appellant, v. MIDDLEBROOK, Administrator of Estate of CHARLES W. ADAMS, deceased, and FASCHIAN et al.

**Division One, February 22, 1907.**

1. **CONTRACT: Consideration: Compromise of Threatened Suit: Injury to Child: Suit for Performance.** The mother, as trustee, sues for specific performance of an alleged contract, made by a deceased physician, to educate and care for her child, or failing in that to leave $5,000 to the child by will, in settlement of injuries to the child resulting from the use of forceps at its birth. *Held*, that an acceptance by her and her husband of such an agreement in settlement of a threatened suit by them against the physician for damages arising from such injuries, was no consideration for the contract. They could not fritter away the child's right of action by swapping that for vague promises to be performed wholly in the future. A suit for the promised sum must stand or fall on the theory that the mother herself was negligently injured, and that her release of her damages for her injuries supports the contract sought to be specially performed.

2. ———: **Child En Ventre Sa Mere: Prenatal Injuries: Right of Action.** Whether damages flowing from negligent injuries to a quick child about to be born, belong to the mother, to be contracted away, as she may elect, or belong in law to the child as a sentient being, is adverted to in this case, but not decided, since counsel on both sides assume that the right of action rests in the mother.

3. ———: ———: ———: **Negligence: Proof: Specific Performance: Consideration.** The mother's suit against a physician's administrator proceeds on the theory that her child was injured by the negligent use of forceps at the time of its birth, that such injuries to the child were injuries to her, and that the physician acknowledged the injury and agreed to settle the damages at $5,000, to be paid in the education of the child, or failing in that by a bequest by will. There was a marking and scarring of the child's forehead, but negligence on the physician's part rests alone on admissions made by him, who was shown to be generous and effusive and might blame himself for a mere misadventure without intending to admit negligence

or liability for malpractice.  On the other hand, the evidence tends to show that the child was not permanently injured, that it was not unusual to use forceps to aid childbirth or to use them without the assistance of a professional nurse or other physician, or unusual to leave marks on the child by use of forceps.  *Held,* that the fact that the child was weakly, slow in learning to walk, required tender nursing, was subject to sick-headaches on exertion, and had to be kept back in school, do not prove malpractice at birth; that, if these facts and the other fact that the child was marked were attributable to the negligent use of forceps at its birth, the connection should have been proved by competent medical testimony; and that, no experts being called for that purpose, the evidence is not of the high probative force that compels a judgment for specific performance of contract based on the negligent acts of the physician.

4. **CONTRACT: Specific Performance.** A contract demanding specific performance must not be biting, unconscionable, supported by foggy and uncertain consideration, but must be just, fair and reasonable and grounded in unequivocal consideration.

5. ———: ———: **Statute of Frauds: Equity: Fraud: Proof.** A contract which in law is non-enforceable, because not measuring up to the requirements of the Statute of Frauds, will be enforced in equity only when not to enforce it would beyond peradventure work a fraud upon the promisee.  And before a court of equity will exercise that function it requires proof showing beyond a reasonable doubt: first, not only that the contract existed, but that the precise contract in suit existed; second, the contract should be so clear and definite as to leave no doubt in intendment and certainty; third, performance on the part of the promisee should be shown, and must be unequivocal and referable alone to the very contract; and, fourth, the acts relied on to show performance must point to that contract and none other.  In short, there must be certainty in the proof beyond a reasonable doubt, and certainty in the pleadings, and from end to end no equivocation in the case.  And this case does not measure up to those requirements.

6. ———: ———: **Proof: This Case: Physician: Childbirth.** In this case the oral contract sued on is not definite, and is essentially variant from the contract pleaded, and the proof is at variance with the theory that there was a contract of the character sued on.  At most it indicates an effusively benevolent testamentary disposition of a physician towards a child, but does not establish a recognized and subsisting contract to bequeath to the child a sum of money as a recompense for injuries to the child negligently inflicted by him at its birth.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale*, Judge.

AFFIRMED.

*Reed, Yates, Mastin & Howell* and *Joseph S. Brooks* for appellant.

(1) The person with whom a contract is entered into for the benefit of another may sue in his own name, in enforcement of such contract, without joining with him such other person; he is a trustee of an express trust within the meaning of the statute. Wright v. Tinsley, 30 Mo. 389; R. S. 1899, sec. 541. (2) An agreement to dispose of property by will in a particular way, if made on a sufficient consideration, is valid and binding, and although circumstances may render it impossible to specifically enforce such an agreement exactly, yet its substantial specific enforcement will be decreed. Wright v. Tinsley, supra; Nowack v. Berger, 133 Mo. 37; Hiatt v. Williams, 72 Mo. 214; Anderson v. Shockley, 82 Mo. 215; Rosenwald v. Middlebrook, 188 Mo. 58; Kinney v. Murray, 170 Mo. 674; McElvain v. McElvain, 171 Mo. 244; Healey v. Simpson, 113 Mo. 340; Teats v. Flanders, 118 Mo. 660; Hale v. Harris, 145 Mo. 214; Alexander v. Alexander, 150 Mo. 179; Lynn v. Hockaday, 162 Mo. 111; Clark v. Cordry, 69 Mo. App. 6; Stone v. Pennock, 31 Mo. App. 544; Lee v. Howe, 27 Mo. 521; Farrow v. Patton, 20 Mo. 81. (3) A contract which, by its terms, is to be performed at the death of one of the parties, is not within the provision of the Statute of Frauds, which requires contracts not to be performed within a year from the making thereof to be in writing. Frost v. Tarr, 53 Ind. 309; Riddle v. Backus, 38 Iowa 81; Smalley v. Greene, 52 Iowa 241; Updyke v. Tenbroeck, 32 N. J. Law 105; Kent v. Kent, 62 N. Y. 560. (4) The consideration shown by the evidence, and alleged in the

petition, was sufficient, and a good and valid consideration for the agreement of the deceased. 6 Am. and Eng. Ency. Law 680; Turlington v. Slaughter, 54 Ala. 195; Farnham v. O'Brien, 22 Maine 475. (a) A release from liability for tort is a good consideration for a promise. Crusselle v. Pugh, 71 Ga. 744. (b) The compromise or abandonment of a doubtful right is a sufficient consideration for a contract, even when it turns out that the point given up was in truth against the promisee. 1 Chitty (11 Ed.), 29. (c) And the same rules prevail in equity; inadequacy of consideration being of itself no ground for impeaching a contract in a court of equity. Forbearance to institute or prosecute legal or equitable proceedings, is a sufficient consideration. 1 Chitty, 35. (d) Giving up a claim where the law is doubtful, is a good consideration. 1 Chitty, 48. (e) If there be a pre-existing legal or equitable obligation to pay, which cannot be enforced, it is sufficient consideration for a new promise to pay. Ellicott v. Peterson, 4 Md. 476. (f) A compromise of doubtful and conflicting claims is a sufficient consideration for a promise voluntarily made, and not induced by fraud, though the claims were illegal and without foundation. Mason v. Wilson, 43 Ark. 172; Richardson v. Comstock, 21 Ark. 69; Barton v. Baird, 44 Ark. 556; Cassell v. Ross, 33 Ill. 245; Honeyman v. Jarvis, 79 Ill. 318. (g) The moral obligation to perform an agreement within the statute is sufficient consideration for a promise. Anderson v. Best, 176 Pa. St. 498; Bailey v. Philadelphia, 167 Pa. St. 569. (h) A very slight advantage to one party, or a trifling inconvenience to the other, is sufficient consideration to support a contract. Marks v. Bank, 8 Mo. 316; St. Louis v. Gas Light Co., 70 Mo. 116. (i) Where consideration is of an indeterminate value, its sufficiency will not be inquired into by the courts. Price v. Jones, 105 Ind. 543; Blake v. Blake, 7 Ia. 46; Buckner v. McElroy, 31 Ark. 97. (5) An

agreement to adopt and care for a child during minority is not within the Statute of Frauds, since it might have been terminated in less than a year by the death of the child during that time. Taylor v. Deseve, 81 Tex. 246; Sharkey v. McDermott, 91 Mo. 647. (6) It is not necessary that the consideration should move from the beneficiary. The fact that the mother was the injured party, and that the child was in law not *in esse,* but a part of the mother, does not affect the right of the mother to recover as trustee for the benefit of the child. Wright v. Tinsley, 30 Mo. 389; Allaire v. St. Luke's Hospital, 76 Ill. App. 441, 184 Ill. 359; Dietrich v. Inhabitants, 138 Mass. 14; Walker v. Railroad, 28 L. R. (Ire.) 69.

*P. E. Hatch* and *C. O. Tichenor* for respondents.

(1) This sort of case has often been before this court, and it differs from them only because it is the weakest of them all. From Sutton v. Shipp (1877), 65 Mo. 297, to this time, the court has decided fifteen cases of this kind, and decisions were against claimant in all but four: Sharkey v. McDermott, 91 Mo. 647, where the petition was held good on demurrer; Alexander v. Alexander, 150 Mo. 579, where the case was made out by letters; Nowack v. Berger, 133 Mo. 24, where the consideration for the adoption of a child was the marriage of the mother to the one adopting; and Lynn v. Hockaday, 162 Mo. 111, where all admitted by the pleadings that the child had been adopted, but the question was whether the adoption was by the husband or the wife. (2) In a suit to specifically perform an agreement for an interest in an estate and to declare the heirs to be trustees to the extent of such interest, for plaintiff, the proof of the contract must be so cogent, clear and forcible as to leave no doubt in the mind of the chancellor as to its terms and character. There must be no doubt in the petition as to the statement

of the case or in the contract. There must be like proof that the acts done unmistakably refer to and result from that contract. There must be no eqivocation or uncertainty in the case. It must be in terms a contract and not a mere declaration of intention or expectation. In fine, there must be a contract definitely and conclusively proven. Casual and loose conversations, when not supported by other evidence, are entitled to little, if any, weight. This is dangerous testimony; is looked upon with jealousy, and should be weighed in the most scrupulous manner. Agreements of this kind are looked upon with suspicion and ought not to be encouraged. These agreements are within the Statute of Frauds and are sustained only where it would work a fraud if one party was allowed to plead it. Goodwin v. Goodwin, 172 Mo. 48; McElvain v. McElvain, 171 Mo. 257; Kinney v. Murray, 170 Mo. 700; Steele v. Steele, 161 Mo. 575; Curd v. Brown, 148 Mo. 92; Fanning v. Doan, 139 Mo. 411; Nowack v. Berger, 133 Mo. 42; Teats v. Flanders, 118 Mo. 669; Cherbonier v. Cherbonier, 108 Mo. 264; Emmel v. Hayes, 102 Mo. 195; Veth v. Gierth, 92 Mo. 104; Asbury v. Hicklin, 181 Mo. 658; Reed v. Morgan, 100 Mo. App. 713; Grantham v. Gossett, 182 Mo. 651; Drake v. Lanning, 49 N. J. Eq. 459; McKee v. Higbee, 180 Mo. 263; Rosenwald v. Middlebrook, 188 Mo. 58; McTague v. Finnegan, 54 N. J. Eq. 457; Woods v. Evans, 113 Ill. 191; Neals v. Gilmore, 79 Pa. 425; Miller's Estate, 136 Pa. 249; 8 Am. and Eng. Ency. Law (2 Ed.), 1017; Nickerson v. Nickerson, 127 U. S. 676; Purcell v. Miner, 4 Wall. 517; Williams v. Morris, 95 U. S. 444; Madison v. Alderson, L. R. 8 App. Cas. 467. (3) Plaintiff claims to be a trustee for her son, and sues as such. Even if there was a contract as claimed to have been made two or three days after the child was born, it created no trust; at most it was simply an agreement with plaintiff for the benefit of her boy; he never could have sued her

upon it as his trustee. To be a trust, some estate must have been conveyed to the trustee; had she received anything from Adams on account of injuries, it would have belonged to her and not to the boy, and even if she had declared in the most solemn form that she held it in trust for the boy, it would have been a falsehood, establishing no trust. This so-called agreement, made just after the birth of the child, was void because of the Statute of Frauds. Packett Co. v. Sickles, 5 Wall. 595. It was not in writing and by no possibility could the baby have been educated, either generally or even specially, as a doctor, during the first year of its existence; nor could Adams, no matter how bright the child may have been, have entered into a contract of partnership with him for the practice of medicine at that age. Even if there was an agreement as to a will, there is no pretense that it was made with plaintiff as trustee. If there was an agreement with plaintiff, as claimed in the first instance, creating a trust, then the trustee could not make a different one in its place (as she claims to have made years afterwards), without the consent of the *cestui que trust.* Hunnewel v. Lane, 11 Met. 167. And if there was a consideration for the first agreement, then the same consideration could not be used for another agreement made about seven years afterwards.

LAMM, J.—Doctor Adams (of middle age) died in Kansas City on August 3, 1899, intestate, possessed of an estate of sixty thousand dollars. Presently, on August 5, of the same year, Mr. Middlebrook of the Kansas City bar qualified and took upon himself the burden of administering upon his estate. On August 9, 1901, Mrs. Kirk and her husband lodged a bill in equity against Middlebrook and the unknown heirs of Adams, the object of which was to decree Mrs. Kirk a distributee in Adams' estate on behalf of her child, Eugene Joseph Kirk, to the amount of $5,000.

Cast on a hearing on the merits, plaintiff appeals here.

By subsequent pleadings (the case being tried on a third amended petition) there were some realignment of parties and readjustment of issues. For example, the husband of plaintiff was made a party plaintiff in the first petition — whether a real or nominal party does not appear. Again, when the suit was brought the heirs of Doctor Adams were unknown. Subsequently, a brother and sister by the half-blood appeared and, intervening, claimed the estate as heirs at law. When the third amended bill was filed (January 21, 1903) the husband of plaintiff disappeared as a party; (reappearing later in the capacity of a witness at the trial); and the brother and sister by the half-blood, with the husband of the latter, were made co-defendants with the administrator. Referring to the readjustment of issues, it may be said we have nothing before us to indicate in what it consists, except, in an additional abstract filed by defendants, it appears that a motion to elect was filed and sustained to the second amended petition; whereupon plaintiffs filed an election in the following words: ''Now come plaintiffs and elect to proceed upon the cause of action arising under agreement of Charles W. Adams, deceased, to provide for Eugene Joseph Kirk, by will, said agreement and promise having been made about the first day of April, 1898, and on other occasions prior to said date, and plaintiffs further state that their action is one in equity, and that their petition seeks and asks only equitable relief.''· Presently, after such election, a third amended petition was filed.

As the case is singular, it will not be space misapplied to let the petition tell its own story, thus:

''The plaintiff, Maggie Kirk, for her third amended petition, leave of court having been first had and obtained for filing same, and this suit having been

dismissed as to Eugene Kirk, and Andrew Faschian, Johanna Bertha Sontgen Faschian, and Johann Hubert Wisner having been made parties defendant hereto, says: That the plaintiff, Maggie Kirk, is the mother of one Eugene Joseph Kirk, a minor, for whose benefit she brings this suit; that the defendant, Robert B. Middlebrook, is the administrator of the estate of one Charles W. Adams, deceased, duly qualified according to law, and now in the discharge of his duties as such administrator; that the said Charles W. Adams died on or about the third day of August, 1899, leaving a large estate of about the value of $60,000, consisting of both realty and personalty, and lying and being situated in the city of Kansas City, Jackson county, Missouri; that said Robert B. Middlebrook has in his possession as administrator such of the personalty as has been discovered, and also is, by the order of the probate court of Jackson county, Missouri, collecting the rents from the real estate of which said Charles W. Adams died seized; that the defendants, Johanna Bertha Sontgen Faschian and Johann Hubert Wisner, are brother and sister of the deceased Charles W. Adams of the half blood and as such are the only heirs of said Charles W. Adams.

"Plaintiff further says that said Eugene Joseph Kirk is of about the age of eleven years and was born on the 30th day of July, 1891; that the said Charles W. Adams, deceased, during his life time was a physician and attended the plaintiff, Maggie Kirk, at the time of the birth of the said Eugene Joseph Kirk, minor, and that the said Charles W. Adams delivered said Eugene Joseph Kirk, son of plaintiff, from the womb of the plaintiff, Maggie Kirk; that said Charles W. Adams delivered said Eugene Joseph Kirk, minor, by the use of instruments, and while so doing used said instruments in such manner that the head of said child was cut and bruised and pressed out of shape.

"And plaintiff further says that the said Charles W. Adams carelessly and negligently cut and bruised the said minor child of the plaintiff about the head by carelessly and negligently twisting, turning, pressing and pulling the aforesaid instruments about the head of said minor child, and so the said Charles W. Adams carelessly and negligently cut and bruised and injured the said Eugene Joseph Kirk, minor child, and the plaintiff, his mother, as aforesaid, about the head of the said Eugene Joseph Kirk.

"The plaintiff further says that the said Eugene Joseph Kirk was, by the above acts of the said Charles W. Adams, injured in such a manner that he has always been weakly and delicate on account of such injuries, and in such manner that he can never have good health.

"And the said Charles W. Adams orally and verbally entered into an agreement with plaintiff on account of the above said injuries to said minor child, and to plaintiff, that he would educate said minor child, and would pay the expenses of said minor child at a medical college, and have him graduated therefrom, and afterwards take him into his office with him as a partner. And said Charles W. Adams further agreed and promised plaintiff that in the event of the death of said Charles W. Adams he would provide for said minor child by will, and would bequeath to him a sum sufficient for a general collegiate and medical education, and to properly start him in the practice of medicine, and thereafter promised and agreed to make a will and to bequeath to said minor child the sum of five thousand dollars, so that the said minor child would be provided for, if the said Charles W. Adams should die before he carried out his agreement with plaintiff to educate said minor child.

"Plaintiff further says that she cannot state the exact date of said oral and verbal agreements of said Charles W. Adams to educate and provide for said

Eugene Joseph Kirk, but that said Charles W. Adams made said agreements with plaintiff shortly after the birth of said Eugene Joseph Kirk, and within six months thereafter, and renewed said agreements and promises on divers occasions thereafter.

"And plaintiff further says that thereafter, on or about the first day of April, 1898, the said Charles W. Adams, then and there being in bad health, and about to go as a surgeon to the Spanish war, and being fearful that he might not be able to carry out his agreement and promise to plaintiff, made for the benefit of said Eugene Joseph Kirk, agreed and promised to provide for said Eugene Joseph Kirk, by will, and to bequeath to him a sum sufficient to carry out the purposes hereinbefore set forth.

"Plaintiff further says that by reason of the premises and by reason of the various promises and agreements hereinbefore set forth, and in consideration thereof plaintiff relinquished all claims against said Charles W. Adams by reason of the above said injuries to said plaintiff, Maggie Kirk, and that she has fully performed on her part all her agreements with said Charles W. Adams.

"And plaintiff further says that said promises and agreements made by said Charles W. Adams with plaintiff on or about the first day of April, 1898, were made in consideration of the facts hereinbefore set forth and in consideration of the prior promises and agreements of said Charles W. Adams with this plaintiff, to provide for said Eugene Joseph Kirk, as hereinbefore set forth.

"Plaintiff further says that the said Charles W. Adams died intestate, without making provisions for the said Eugene Joseph Kirk, and that the defendant, Robert B. Middlebrook, was duly appointed administrator of his estate, and now has charge and control thereof, and has in his possession as such administrator

real and personal property of the deceased of about
the value of $60,000. That under and by virtue of the
premises herein and the promises and agreements of
said Charles W. Adams to provide for said Eugene
Joseph Kirk and to bequeath to him the sum of five
thousand dollars by will, the said Robert B. Middle-
brook as administrator of the estate of said Charles
W. Adams, is a trustee for the performance of the
agreements and promises of said Charles W. Adams
made to this plaintiff for the benefit of said Eugene
Joseph Kirk.

"Plaintiff further says that she was at all of the
dates herein mentioned and now is a married woman,
and the wife of one Eugene Kirk.

"Plaintiff further says that more than a period
of two years has elapsed since the issuing of letters
to the administrator of the estate of the said Charles
W. Adams, the defendant, herein, and since the publica-
cation of notice thereof, and that no further statutory
claim against said estate can be filed under the law,
but there is pending in court a suit against said Robert
B. Middlebrook and the other defendants herein, claim-
ing the whole of the estate of the said Charles W.
Adams, said suit being brought by and on behalf of one
Rosenwald.

"Plaintiff further says that all the debts of said
estate have been fully paid off, discharged and satisfied,
and that there remains, after the same were paid and
discharged, realty and personalty of about the value
of $60,000, and that all of said property is in the hands
and possession of said Robert B. Middlebrook as ad-
ministrator of the estate of said Charles W. Adams.

"Plaintiff further says that by reason of the prem-
ises and of the promises and agreements and contract
of the said Charles W. Adams, above set forth, she
is entitled to be declared a distributee of the estate
of Charles W. Adams, as trustee for said Eugene Jo-

seph Kirk, and to have as such trustee a judgment against said Robert B. Middlebrook, as administrator of the estate of said Charles W. Adams, for the sum of five thousand dollars, or for such sum as would be sufficient to carry out the said agreement between plaintiff and the said Charles W. Adams.

"Wherefore, plaintiff prays judgment that she be declared a distributee of the estate of said Charles W. Adams, for the use and benefit of said Eugene Joseph Kirk, and that the defendant, Robert B. Middlebrook, administrator of the estate of said Charles W. Adams, be declared a trustee for the use and benefit of said Eugene Joseph Kirk, and that said Robert B. Middlebrook, defendant, be ordered to execute and perform said contract and promises and agreements, entered into by and between this plaintiff and the said Charles W. Adams, in his lifetime; and plaintiff further prays that this order may be so extended as to bind the defendants, Johann Hubert Wisner, Johanna Bertha Faschian and Andrew Faschian, her husband, as the heirs, and distributees of said Charles W. Adams, deceased, and that she may have judgment against said Robert B. Middlebrook administrator and said defendants as trustees for the benefit of said Eugene Joseph Kirk for the sum of five thousand dollars, or such other sum as the court shall find adequate and sufficient for the performance of the contract and agreements of said Charles W. Adams, deceased, with this plaintiff, and for such other relief as to the court may seem meet and proper."

The answer is as follows:

"Defendants for answer to plaintiff's third amended petition deny each and every allegation thereof excepting only such as are hereinafter expressly admitted.

"Defendants admit that Maggie Kirk is the mother

of Eugene Kirk, a minor, and that she is a married woman, the wife of one Eugene Kirk.

"They admit that Johanna Bertha Sontgen Faschian and Johann Hubert Wisner are the sister and brother of Charles W. Adams, deceased, and his sole heirs, and that Robert B. Middlebrook is the administrator of his estate, qualified and acting as such.

"That said Adams died, August 3, 1899.

"And defendants while denying that said Adams made any contract to support, educate or make a partner of the child of Maggie Kirk, say that said contract, if made, would have been void because within the Statute of Frauds, being verbal and one not able to be performed within a year after the alleged making thereof, and they say the same, if made, which they deny, was so vague and indefinite as to be wholly void; and while denying the making of such contract, they say, if made, it would have abated with the death of said Adams, and while denying that any agreement was made by Adams with Maggie Kirk on or about April 1, 1898, or at any other time, say that there would have been no consideration whatsoever for the same had it been made. Wherefore they demand judgment."

The reply is a denial of new matter and a reaffirmance of the allegations of the petition in avoidance of such matter.

The facts on plaintiff's side were uncovered in a deposition of Mrs. Emelia Hewer, in the oral evidence of Annie E. Ryan (a sister of plaintiff), and in the oral evidence of Eugene Kirk (husband of plaintiff), and the testimony should be looked to with care and detail; because we may assume it was held insufficient, *nisi*, to support a decree, and in this court it is fervently contended that holding was wrong.

Attending to the facts: Mrs. Hewer's deposition was taken in San Francisco in April, 1902, where she had resided for two years. Prior to that she and her

husband had lived in Kansas City for eighteen years, and at one time had lived three doors from plaintiff, and witness put herself down as an intimate acquaintance of the Kirks. It seems witness and her husband (now dead) ran a bakery and confectionery in Kansas City and, about fourteen years prior to the date of her testimony, got acquainted with Mrs. Kirk, then single, and, as we take it, the acquaintanceship, at first a business one, finally broadened into social intimacy. For the same length of time the witness knew Doctor Adams. On the date of the birth of the child, Eugene, Mrs. Hewer lived in another part of the city, some seven miles away. It seems that three children were born to the Kirks; the oldest, Eugene; the next, a girl, Geraldine; and the next a boy, Julian Charles Adams Kirk — the memory of Doctor Adams, deceased, being perpetuated in the name of the last child. On being inquired of if Doctor Adams attended Mrs. Kirk in her sickness at the birth of all her children, the witness replied: "At the last child they had another physician because she was very sick and they were afraid to trust Doctor Adams on account of the first child; he was with her second child, but another physician was there too at the second child." On being inquired of if she was present at a conversation between Doctor Adams and the plaintiff, she said she was and that the conversation was at Mr. Kirk's house — "the first conversation." She was then asked about when that was, and she replied: "I forget just when; the child was eight or nine years old, and the conversation was either eight years this fall or nine. I wouldn't be positive about it, but it was between that time, eight or nine years." Continuing she said it was held at the Kirks' home. And on being asked to state this conversation fully, she replied: "Of course they were going to bring suit against the doctor for damages." (This answer was objected to at the trial as a conclusion, and the

objection was sustained). Thereupon this question was put to her: "For what?" Her answer was: "Malpractice when the child was born and Doctor Adams said he would settle with them, educate the boy as a physician or in case of his death or anything he would leave him $5,000 — will him that money." (At the trial that portion of her answer "malpractice when the child was born," was objected to as a conclusion and not a statement of any fact. This objection was sustained). Thereupon the examination was continued as follows: "Q. He would educate him for a physician? . . . A. Yes, sir. Q. Or in case of his death he would leave him $5,000? . . . A. He would leave $5,000; he said that it was his neglect that the child was injured, and of course the mother was injured, too." [At the trial that portion of the answer, "of course the mother was injured, too," was objected to as a conclusion and not a statement of fact, and the objection was sustained]. Continuing, the deposition runs thus: "Q. What business or profession, if any, did he say he would educate or train the child for? . . . A. For a physician. He claimed that it would take that amount of money to educate him for a doctor. . . . Q. Do you know what part of the child was injured? A. The child's head; he showed that he was injured. . . . Q. Did you ever hear him say that the child was injured? . . . A. He said that it had affected his head and might affect his brain. Of course up to the time of his death he cared for the child all the time. In fact, he would go over there or have the child at his office nearly every day. . . . Q. Did you ever see the doctor give the child any money? . . . A. Yes, sir, I have. . . . Q. Do you know whether he sent the child to school and paid the costs of the school? . . . A. He sent the child to school and paid the costs. . . . Q. What school? . . . A. It was called the Christian

Brothers School. . . . Q. In what city, where?
A. Kansas City, Missouri. Q. Did you ever
hear the said Doctor Adams speak of the child being
injured? . . . A. Yes, sir. Q. If so, when
and how? . . . A. At the childbirth and after-
wards. Q. Injured at childbirth? A. Yes, sir. Q.
And that he was the doctor and it was through his
fault? . . . A. Yes, sir. Q. Did you ever hear
the deceased Doctor Adams say to the plaintiffs, Mr.
Kirk and wife, that the child would always be delicate
by reason of injuries at childbirth? . . . A. Yes,
sir. I heard him say that several times. . . . Q.
Did you hear him say it to the plaintiffs? . . . A.
Yes, sir. Q. Did you ever hear the deceased Doctor
Adams speak about making his will and providing for
the child, and if so, when and here? . . . A. About
the time of the Spanish war; that was in his office. Mrs.
Kirk, myself, and the oldest child were present and we
were to have waited there; I was to be a witness to
the will and he was to leave $5,000 in case he shouldn't
come back or anything happened to educate the boy,
and also that he would leave it so that they couldn't
spend it, to be direct to the child. . . . Q. So it
would be for the interest of the child only? . . . A.
And something happened; the lawyer didn't come to
make the will and the doctor was called away; he was
one of the physicians in the German Hospital and he
had to be there for a certain time of day. . . . Q.
And the will wasn't made? A. No, the will wasn't
made."

On cross-examination Mrs. Hewer said she was not
at the Kirks' home when the child was born, but came
there the day after. At that visit Doctor Adams was
present, and in the hearing and presence of three per-
sons, and no more, to-wit, witness, Mrs. Kirk, and the
husband of that lady, in the confinement room, made
statements relating to the birth of the child. Being

asked what he said, she replied: "He simply said the child was injured in the head and the mother, too." Her deposition at this point continues as follows, omitting objections by counsel:

"Q. When did he next make any statement to the plaintiffs in your presence with regard to the condition of the child? A. The next statement was when they were going to bring suit.

"Q. When was that? A. The child wasn't very old, two or three days, when they were going to bring suit because she was very sick and the child was very sick and badly injured.

"Q. Who said that they were going to bring suit? A. Mr. Kirk and Mrs. Kirk.

"Q. Both said so? A. Yes, sir, in the presence of Dr. Adams and myself.

"Q. Did I understand you to say that Mrs. Kirk was not expected to live? A. She was a very sick woman and was injured when the child was born through malpractice. . . .

"Q. Although Mrs. Kirk was a very sick woman and was in the condition that you describe, she was still well enough on the second day after the date of the birth to accuse the doctor of malpractice and threaten suit? . . . A. That is what I want to say: Mr. Kirk wanted to bring suit right away and his wife said yes.

"Mr. Mack: Q. In the presence of any one? A. In the presence of the doctor and myself.

"Mr. Engs: Q. Then, Mrs. Hewer, on the second day after the birth of the child Dr. Adams was charged with malpractice by Mr. Kirk and in the room in which the birth took place? A. Yes, sir.

"Q. In the presence of yourself and Mrs. Kirk? A. Yes, sir.

"Q. Against the doctor? A. Yes, sir.

"Q. Because of the dangerous condition of his wife? A. And the child.

"Q.  And the child, and Mrs. Kirk agreed to do so?
A.  Simply said yes.

"Q.  Also in your presence?  A.  Yes, sir.

"Q.  And this all occurred in the confinement room?  A.  Yes, sir.

"Q.  On the second day after the birth of the child?  A.  I wouldn't be positive, second or third.

"Q.  You are positive that you were at the Kirks' on the day after and also on the second or third day after birth?  A.  I went out every day until the child was eight or ten days old. . . ."

Having said she visited Mrs. Kirk to take her delicacies because she was a very sick woman and they were friends and thought a good deal of each other, Mrs. Hewer testified that from the time the child was born up to the time she left Kansas City (eight or nine years) she "saw the child pretty near every day." In this connection she testified that he went to school by her store; that he commenced going to the school at the age of six or seven and attended, to witness' personal knowledge, for seven months before she moved away from Kansas City; and that during that time Eugene was brought to her home by her son, a larger boy attending the Christian Brothers school, several times, suffering with a headache. The deposition concludes as follows, omitting some immaterial matter:

"Q.  Do you consider him a deserving boy for whatever the doctor might do for him?  A.  Yes, sir.

"Q.  Very bright boy, was he?  A.  He would have been a bright boy only being injured in the head.

"Q.  How do you know?  A.  He showed it.

"Q.  What was his standing in school?  A.  I couldn't tell you that; the child hadn't been very long going to school.

"Q.  Why do you say he would have been a bright boy had it not been for being injured in the head?  A.  He was injured in the head and could not study like

other boys, but would come home sick. I know that to be a fact. I had a son that went to the same school and my son was older and used to bring the little fellow home. . . .

"Q. At this time this boy was how old? A. He started to school about six, between six and seven, and I couldn't say of course, but he had been going there to school I think about seven months when we left.

"Q. What was his record in school? A. I couldn't tell you that.

"Q. But you said he would be a very bright boy except for the injuries to his head? A. Yes, sir; I expect he would; that is always what the doctor always claimed, he would be if he had not been injured in the head, he would be smart.

"Q. Wasn't he a smart boy? A. I wouldn't count him a smart boy.

"Q. Was he smart or not? A. Not what I would call a smart boy.

"Q. Was he a stupid boy? A. Kind of stupid; yes, sir; of course he was a child, a stupid child from being injured in the head. . . .

"Q. I want the witness to answer me whether or not the child was a stupid or a bright or simply an average child? A. If I must say it, he was a very stupid child, but I don't like to say it on account of his mother.

"Q. When did Dr. Adams make a statement to Mr. and Mrs. Kirk to the effect, as you have testified, that he was responsible for the injuries to the child and that he would do for him what you have testified he would do? A. Just as soon as the child was born, either two or three days.

"Q. What did he then say? A. He said the child was injured, and the mother was injured and he would take the child and take care of him and educate him for a physician, and in case of his death leave him

$5,000 to educate him, because it would take that amount to do it.

"Q. That was how many years ago? A. That is either eight or nine years ago; I am not positive.

"Q. It was the second or third day after the birth of the child? A. Yes, sir; I am positive of that.

"Q. And you remember those were his very words? A. I remember those were his very words. I am postive of that, and I heard him say that several times.

"Q. At what other times? A. At different times; I couldn't tell you how often; I heard him say that a dozen times or more about the child; he always felt very bad about the child."

Annie E. Ryan (aunt of the child and sister of plaintiff) testified that she was living with the Kirks when Eugene was born and saw him an hour after his birth. Being asked what was the condition of the child then, she replied: "Why the doctor thought it was dead and its head was all mashed, just terrible, it was in an awful condition — the doctor didn't think — Q. The head of the child? A. Yes, sir. Terribly marked." Witness said the scars still existed in front and back of the head and could be seen. Having testified that the boy was delicate and weakly, that he was backward in learning to walk and had to be tenderly nursed (at one time being sent to another climate) and was subject to sickheadaches on the least exertion, the following closed her examination in chief:

"Q. Did you ever have any conversation with Dr. Adams in reference to the birth of the child? A. Yes, sir.

"Q. What did he say about the condition of the child? A. Well, he said that of course he was very sorry; he said that Eugene would never be well, but he hoped with good care and good exercise that he would probably live.

"Q. Did he state why he would not give any reason for it? A. Yes, sir; he said, of course, that it was on account of the use of the instruments at his birth, and he said that was the cause of it on account of his head, that caused his terrible headaches.

"Q. Did you ever hear any conversation between him and Mrs. Kirk in reference to the injuries of the child? A. Yes, sir; shortly after the child was born, why Mrs. Kirk was going to bring suit against the doctor, and the doctor told her that if she would not, why, he would take the child and educate him and take care of him; he said, of course, the child would never be strong, and he would do what he could; that he didn't like any suit, and, of course, he said, while he knew it was his fault, he didn't know the condition, and didn't think he needed another doctor at the time, else he should have had it, and that he would take care of the child and educate him; and with the promise of that, why Mrs. Kirk, of course, let the suit go; she told him that she would be satisfied then; all she wanted was to have the child well taken care of.

"Q. And that was shortly after the birth of the child, you say? A. Yes, sir.

"Q. Did you ever talk to the doctor afterwards about that? A. Yes, sir; several times; he spoke to me just before he went — he was going to the Spanish-American war with Battery B; he got his suit and everything and he was ready to go, but the company was not sent out, and he told me he sent for a lawyer and was going to make his will; he would leave Eugene the $5,000 because he didn't never expect to come back, his health was not good, and it would fix everything all right."

The cross-examination of this witness somewhat baffles condensation—that is, its true import will be missed in a free outline. Furthermore, it is of value in sifting the story of the witness and testing its rea-

sonableness and consistency, not only with her testimony in chief, but with the testimony of Mrs. Hewer. It is better, therefore, to give it in full, rather than to permit brevity at the expense of accuracy.  Here it is:

"Q.  Where was this talk you had with the doctor, when he said he was going to the war?  A.  It was at his office on Main street.

"Q.  Whom were you with?  A.  I was with Mrs. Hewer and sister and had Eugene with me.

"Q.  Mrs. Hewer in her testimony does not say you were there?  A.  Well, but I was there; I know she doesn't say, but I was there just the same.

"Q.  How did you all happen to be there?  A. Why, we went up to see; he was going away and he sent us word to come down, he wanted to see us before he went away.

"Q.  Wanted to see you?  A.  Yes, sir.

"Q.  See all of you?  A.  Yes, sir; wanted to see us all.

"Q.  Wanted to see you?  A.  Yes, sir; I guess he did; he sent for me.

"Q.  He sent for you?  A.  Yes, sir.

"Q.  How do you know he sent for you?  A.  Why, he sent word out to the house that he was going to the war, and wanted to see us before he went.

"Q.  Who did he send to the house?  A.  His collector; I don't know who he was.

"Q.  You saw him, did you?  A.  Yes, sir; I saw him.

"Q.  Who was present when that collector came? A.  Why, I don't remember, but whoever was at the house was there, and I think that he asked —

"Q.  Who did the talking with this collector?  A. I did.

"Q.  You did?  Was your sister present?  A.  I think she was.

"Q. Was Mrs. Hewer present? A. No, sir; she was not.

"Q. How did you happen to get word to Mrs. Hewer? A. I went up and got Mrs. Hewer.

"Q. Oh, you went up and got her? A. Yes, sir.

"Q. What time of day was it? A. Why, it was about four o'clock.

"Q. What did this boy say — this was a boy that came here? A. Yes, sir; he was a young man about 18, I guess.

"Q. What did he say? A. Why, he just said that the doctor wanted me to come down to the office; he wanted to see me on some business.

"Q. Wanted you to come down to the office; wanted to see you on some business? A. Yes, sir.

"Q. He didn't have any business with you, did he? A. I don't know whether he did or not.

"Q. Well, I know, but you know from the way the thing turned out he didn't have any business with you at all? A. Well, I suppose that he did aim to, I don't know.

"Q. Did he have business with you at that time? A. Probably he wanted to tell me about this, about Eugene, that he was going to war.

"Q. But you said the boy came down there to your sister's house, or Mr. Kirk's house, and wanted you to come down to his office, he had business with you? A. Yes, sir.

"Q. Now, did he have any business with you? A. Yes, sir; he did.

"Q. What business did he have with you? A. Well, do I have to tell it? I will tell if he wants to know.

"Mr. Brooks: I don't see how that is material to this case.

"The Court: It is proper cross-examination.

"To which ruling of the court plaintiff then and there duly excepted.

"A. Why he had a vase, an elegant vase there that cost $1,500, he got at the World's Fair, and he wanted to leave it to me.

"Q. Leave it to you? A. Yes, sir.

"Q. So that was the business that he had with you? A. Yes, that is what he sent for me for.

"Q. And he wanted to give it to you then? A. Yes, sir.

"Q. And he did give it to you? A. Yes, and I wanted him to take it back, and I told him I had no use for it.

"Q. You declined the gift? A. Yes, sir; I did.

"Q. So that was the business he had with you? A. Yes, sir.

"Q. Wanted to make you a present of a $1,500 vase? A. Yes, sir. He bought it at the World's Fair, so he told me.

"Q. And you declined it? A. Yes, sir.

"Q. And never did get it? A. No, sir; never wanted it.

"Q. And that is what the boy said he wanted you to come down there; he had business with you? A. Yes, sir.

"Q. Have you any idea why he wanted to make a present to you of a $1,500 vase? A. I don't know why; I suppose he was going away and didn't suppose he was ever coming back.

"Q. Why didn't he make it to Mrs. Hewer? A. I don't know why; Mrs. Hewer heard him make it.

"Q. Mrs. Hewer heard him make the offer, but you have no idea why he made that offer to make you a present of a $1,500 vase? A. Probably because he knew I never talked about the case, and had always been a good friend of his, and always bragged on him

as a doctor, which I had, and I done him lots of good in his profession.

"Q. So that was a sort of a present for the advertising? A. Yes, sir; I suppose it was; I can not take it for anything else, only that it was that.

"Q. Gave that and credited it to advertising? A. Yes, sir.

"Q. But at any rate you didn't think the advertising you gave him was worth $1,500, did you? A. Well, I didn't feel like it was to me; that is, that I agreed to accept it.

"Q. Well, that is all the boy said, was it? A. That is all.

"Q. Yes, and on the strength of the boy coming down there to the house and saying that the doctor wanted to see you on business, the business was to give you this $1,500 vase; Mrs. Kirk went down, and the boy went down, and you stopped to get Mrs. Hewer and she went down? A. Yes, sir; I went by for Mrs. Hewer.

"Q. Why did you get this Mrs. Hewer? A. Well, she liked the doctor, he was a great friend of hers, and he wanted to see me before he went away, and he was treating her besides, and she just liked him and thought a great deal of him, and she wanted to go down and tell him good-bye before he left town, that is all; so I went by and got her to go down; besides I took her with me.

"Q. All of you went in? A. Yes, sir.

"Q. The boy and Mrs. Kirk? A. Yes, sir.

"Q. And yourself and Mrs. Hewer? A. Yes, sir.

"Q. You found him there, did you? A. Yes, sir.

"Q. How long did you stay there? A. We stayed about an hour.

"Q. About an hour? What were you doing during that hour? A. Just talking.

"Q. Just talking? A. He showed me all around through the offices, and he fit on his suit that he had to go away in, and wanted to show it and see how nice he looked in it.

"Q. You never had seen the offices before? A. Well, he had most of the papers, he said, fixed up, and everything, to go to war, and he said that he had sent for Mr. Middlebrook to make his will and everything of that kind; he said he had only three days to get it all fixed up in.

"Q. Well, you stayed there an hour, did you? A. Yes, sir.

"Q. And the doctor was there an hour? A. Yes, sir.

"Q. All of you were there an hour? A. Yes, sir.

"Q. And no will was drawn? A. No; no will was drawn; he said he had drawn a will there; I didn't know whether he had or not.

"Q. But in this conversation he said he had already drawn a will? A. He said he had it all fixed, and all he wanted was the lawyer, and I know that he telephoned for a lawyer, because I was right there when he telephoned.

"Q. He telephoned for whom? A. I was there after that, I was there next day, he telephoned for Middlebrook, and Mr. Stevens telephoned three times for Middlebrook, the day he died, and couldn't get him; Middlebrook said he was busy and could not go up there.

"Q. The day he died — were you there the day he died? A. Yes, sir; I was there at four o'clock in the afternoon, and he died that night; he was supposed to leave that day.

"Q. You were down there that day? A. Yes, sir; I was down there that day.

"Q. Had he sent for you that day? A. No, sir; he did not.

"Q. How did you happen to be there? A. I went up to see him.

"Q. Went up to see him? A. Yes, sir.

"Q. Well, you were there altogether an hour and Middlebrook did not come and no will was drawn? A. No, I guess there was not; there was none found; I believe it was not drawn.

"Q. Well, he talked about drawing a will; your understanding was he was going to draw a will right then and there? A. Yes, sir.

"Q. While you were there? A. No, he didn't say he was going to draw it while we were there; he said he had the papers and everything all ready.

"Q. What papers did he have? A. Well, he said all his business was put in order, and he said that, of course, he had fixed this Eugene — he said, 'I fixed Eugene, all right,' he said, 'so he can have this money,' he said, 'if I don't come back,' and he says, 'it is not — I don't have any idea that I'll ever come back, because,' he said, 'I am not well at all,' and he said, 'of course, going to war is a kind of a serious affair.'

"Q. Especially to a doctor. Well, you did not understand then that the will was to be drawn right then and there, while you were there? A. Well, I always thought the will was drawn, and I believe still that he made a will that day — yes, I do.

"Q. I say, you got an idea then from your conversation there that he already had a will? A. Yes, sir; I had.

"Q. And you believe now that he did have a will? A. Yes, I think he did; that is my candid and honest opinion, that he had a will.

"Q. And you think somebody destroyed it, don't

Kirk v. Middlebrook.

you? A. Well, I don't know; I think he had it and so I don't think it has ever been found.

"Q. Well, if he already had a will in existence at that time, and if his conversation there with you on that day, all of you, led you to believe that he had a will, and you say that you believe he had a will up to the time of his death — ? A. Yes, sir.

"Q. What in the world did he want of Middlebrook? A. I don't know what this young man wanted with a lawyer after a man is going to die; it is a very foolish thing for them to do it.

"Q. Now, what did he want with a lawyer, with Middlebrook? A. I don't know.

"Q. Ma'am? A. I don't know what he wanted with him.

"Q. You haven't the slightest idea what he wanted with him? A. No.

"Q. Who is Stevens; you spoke of Stevens? A. He was a friend of his that was in the building there.

"Q. He was there, too, was he? A. He lived there all the time; had a little lounge next door to them.

"Q. Was he there on this occasion? A. He telephoned for a lawyer.

"Q. He was there when you came in? A. Yes, sir; he was there when I came in.

"Q. Well, where is Stevens now? A. He is dead.

"Q. He is dead? You did not hear him state what he wanted with Middlebrook on that day? A. No; I don't know as I did; I understand that he wanted to see about the will; I don't know what there was about the will he wanted to see, probably he wanted to change some things in the will, but I know he sent for Mr. Middlebrook; you can find that out from Middlebrook.

"Q. Of course, I was trying to get at the facts.

201 Sup—18

I don't know anything about this case and for that reason I ask these questions. Now, Stevens was there when you went in, was he? A. Yes, sir.

"Q. But Middlebrook did not come? A. No, he did not come.

"Q. And there was nothing done? A. Nothing done.

"Q. And you all went away? A. There was no all there; nobody there but me that I know of; there might have been some more.

"Q. On that day I thought you said Mrs. Kirk was there and Mrs. Hewer? A. Oh, no, this is the day he died.

"Q. Oh, excuse me, but I am talking about the day when the will was made, you say you went down there, dressed up in holiday clothes, and bid him good-bye. While you were there then you got an idea from what happened there on that day that a will had been drawn? A. Yes, sir; I had an idea.

"Q. And you believe now that he died leaving a will? A. Yes, sir; I firmly believe it.

"Q. Now, you say this boy is — don't go to school now? A. Yes, sir he does go to school.

"Q. And has been going to school all his life now since he got to school age? A. Yes, sir; he has.

"Q. And he is rather an extraordinarily bright little fellow, isn't he? A. I think he is bright.

"Q. Isn't he a long ways, a longer way ahead in school than most of his fellows? A. No, sir he is not. His sister is ahead of him, and she is three years younger.

"Q. Three years younger? A. Yes, sir.

"Q. He is about twelve years old, isn't he? A. Yes, sir.

"Q. And he goes in the high school next year, does he? A. I don't think so.

"Q. Do you know how far along he is in school?

A. You are mistaken, he don't go next year to the high school.

"Q. Now, isn't it the truth that he is a remarkably bright boy? A. I don't think according to the other children; he is bright, of course, he is smart considering some people's children, but then I would not call him — he is not smart considering his sister or his other brother.

"Q. Now, of course, rather an extraordinary family, isn't it? A. I don't think so.

"Q. Well, he has gone to school right along, hasn't he? A. Yes, sir.

"Q. How many years has he been going to school; this Mrs. Hewer testified about his going to school six years? A. Well, he did; he began going to school — well, he was not six when he started.

"Q. He has been going to school now pretty near six years? A. The first year he only went about a month; then he went for about seven months, I guess.

"Q. How many years has he attended — he is not quite twelve years old? A. No.

"Q. He is twelve years old in July? A. Yes, sir; twelve years in July.

"Q. How many years of his life has he been going to school? A. About six, I guess.

"Q. Now, these other children you say are stout and hearty children? A. Yes, sir.

"Q. One of them was named after Dr. Adams, wasn't it? A. Yes, sir

"Q. How old is that child? A. He will be six in August.

"Q. Six in August? When was it your sister first threatened bringing suit? A. Why, right after the child was born, about three days.

"Q. About three days? A. Yes, sir.

"Q. Well, it was soon there, she talked about bringing the suit? A. She did not talk about it very

much; her husband talked about it, and told her, and everybody that knew of it, told her, and of course the doctor, himself, he told her, he was not trying to deny it or anything of that kind, what he done — of course, he did, and nobody in the world was any more sorry than he was. Dr. Adams was a perfect gentleman and done everything that is all right and honorable as far as he could.

"Q. What I asked you was whether your sister threatened to bring suit within three days? A. She did; yes, sir.

"Q. Didn't she threaten the trouble after the child was born? A. Well, I don't know whether she did or not.

"Q. When was the first time you heard her threatening to bring suit? A. Because I was so scared because I don't know what they did say the first two or three days around there.

"Q. You know it was within three days that she was threatening to bring suit? A. Yes, sir; I know it, and I know that Dr. Adams told her if she would not bring the suit, that he would take care of the child, and he would educate him, or if he did, in case he died, he would give him $5,000. That she said was all she wanted — to see that the child ——

"Q. (Interrupting) Agreed to make him partner, too, did he? A. No. He said he would take him in the office; I don't remember anything about the partner.

"Q. The petition says he agreed to make him partner. You didn't hear about the partnership business? A. I know he promised to take him in the office, I do know that, and he told me a thousand times in my presence.

"Q. Just an even thousand? A. Yes, sir; maybe one more.

"Q. Yes, maybe one more. Now you consider

yourself testifying to the truth? A. Yes, sir; I do; nothing but the truth.

"Q. When you say you heard him say this a thousand times and maybe one more? A. Yes, sir; I did.

"Q. Well, now, on this third day, when the baby was three days old, he was talking about taking him in his office? A. Why, he said he'd educate him as a physician and take him in his office; he said that lots of times.

"Q. So when this baby was three days old he was talking about educating him? A. He said, of course, that is if the child would live; that he thought with good care it might; he didn't have no hopes of the child hardly.

"Q. He didn't say what he would do in case the baby didn't want to be a doctor? A. No, he didn't say; he said he would educate him.

"Q. He was going to make him a doctor anyway. Now, this was three days — the child had only been three days old when this talk about bringing the suit was sprung? A. Probably, I don't know, but probably they did.

"Q. This woman out in San Francisco — she said it was within a day that your sister was talking about bringing suit? A. Probably within a day; I was so scared and I had so much to do with the child, that I didn't talk about what they'd do with the doctor. I got another physician I know, and the physician told me the child would not have any health.

"Q. What is the physician's name? A. Dr. McDonald.

"Q. Is he dead? A. Yes, sir; he was our family physician.

"Q. So then you were so scared along that time you don't have a very distinct recollection, do you, about matters? A. Well, I don't know whether it was — I am very positive about all of us being there on

the third day and talking about it; I am positive about that.

"Q. What was it you said several minutes ago about being so scared that you could not recollect? A. Well, because we expected my sister and the baby both were going to die, and the doctor told me when I came, he said, 'Now, she is all right, you needn't worry,' that is before the child was born; he said she was in perfect condition and there was no excuse for anything of that kind happening; he says, 'Why, that is nothing to be scared of;' he said, 'everything is all right, Mrs. Kirk is in perfect health.' She was not able to sit up for one month.

"Q. He may have said he was going to make this baby a partner? A. Yes, sir; he may have said it; I don't know.

"Q. How old was Dr. Adams at that time? A. How old was he?

"Q. Yes. A. I have no idea.

"Q. Well, you have some idea of his age? A. No, sir; I have not.

"Q. You could tell whether he was eighty or whether he was forty, couldn't you? A. Well, I don't think he was either one.

"Q. Well, what was he? A. I think he was about 33 or 34 years old; he may have been older and may have been younger.

"Q. Did you ever talk this matter over with anybody? A. No, sir; I never mentioned it to anybody, only talked to Mr. Mastin a few minutes ago, a while ago.

"Q. But up to a few minutes ago, these gentlemen didn't know what you knew about this case? A. No, sir; they didn't know a word about it.

"Q. Didn't know a word of what you knew about this case? A. No, sir; they did not; I talked to several people outside about it; I never talked to Mr.

Brooks, and just spoke to Mr. Mastin a few minutes ago.

"Q. Mentioned to him what you would swear to? A. No; he didn't ask me, but I told him what I knew.

"Q. You never talked to your counsel, to this counsel either? A. No, sir.

"Q. As to what you would swear to here to-day? A. No, sir.

"Q. And they didn't know a thing in the world about what you would swear to? A. I don't know whether they knew; I suppose my sister told them I was there when these things all happened; they may have knew I know it, but I never talked to them about it until this morning; of course if I had been where they could have seen me I would have talked to them about it.

"Q. Now, at this time when he was dressed in his regimentals, and offered to give you a $1,500 vase, what did you say he had specified in his will, how much was he going to give the boy, or had he given him in his will? A. He said he gave him $5,000; he thought that would be enough to educate him.

"Q. He said he had given him $5,000 in his will? A. He didn't say it in just that way. He said that 'I fixed Eugene;' he says, 'I left him $5,000;' he said, 'I have got everything all fixed.'

"Q. 'I have left him $5,000.' When did the doctor die in reference to this time that you went there? A. Why he died on the 3d day of August in the night; he died in the night sometime.

"Q. I know, but in reference to this time that you went there and talked to him when he said he left him $5,000? A. Oh, well, I couldn't say just when it was, but it was just before the Third Regiment went to the Spanish war; you know he expected to go with Battery B, and they sent a battery from St. Louis, and so,

of course, then he stayed home; he would not go because Battery B could not go; he was surgeon.

"Q. Do you think that it was during the same year? A. That what?

"Q. That he died that you had this talk? A. No, I don't remember whether — no, he did not die I don't think that year, I would not be certain; I don't think it was, though; I don't know what year he died, and I don't know when it was he went to war, either, but I remember the circumstances."

Mr. Kirk, the husband of plaintiff, was put on the stand in her behalf, and testified that, as agent of his wife and at her request, he went to see Doctor Adams between "three and six weeks after the child's birth." The object of this visit, in the language of the witness, was "to talk to Doctor Adams in regard to the injuries to the child and what he done." When asked what his wife requested him to go and see Doctor Adams about, his answer was: "In regard to a settlement for the injuries of the child" — that his wife had talked the matter over with him, and that he went to see the doctor as above indicated. The witness saw Doctor Adams on said mission and talked matters over with him, and this is what occurred at that interview: "He told me that the child was injured and would never be strong, but that he thought with care and attention that he might perhaps outgrow it, but that he would never be able to do any labor, or anything of that kind. I asked him what he intended to do about it, and he said he would take it upon himself to care for the child as far as his medical services were concerned; that if the child lived, as he thought it would, that he would take him into his office and educate him and make a physician out of him, would look after him and see that he was properly cared for. That was the substance of that particular conversation. I have had others with him numerous times since."

Witness having testified, as aforesaid, that he had other conversations with Doctor Adams at numerous times since, and having further testified that he was acting for his wife all the way through whenever he mentioned the matter to Doctor Adams, was only called upon to give one other conversation, as follows:

"Q. Did you at any time in 1898 go to see the doctor at her request and for her? A. I did.

"Q. When was that? A. That was before the doctor — it was at the time of the mustering in of Battery B, I think it was; he was surgeon for Battery B and he expected to leave and I called several times at his office in the Ridge building along about that time; I don't remember the date.

"Q. Now, did you talk to him about a settlement of the matter at that time? A. I did.

"Q. Now, what was that conversation? A. Well, the substance of the conversation was that he ———

"Mr. Tichenor: Give the conversation, not the substance of it.

"A  I can not remember it in detail or the words, or anything of that sort. I can give what he said, what he said on that occasion. He was very much elated over the prospects of going to the war, and I talked to him in a friendly way, and he talked over his health — the condition of his health. I suggested at that time that it was rather a dangerous proceeding for a man in his condition to talk about going to war, and he laughed and said that, 'Well, it would either be a case of kill or cure,' and he rather thought it would do him good, and he stated at that time that he had made his will and everything, and that if he did not come back that everything would be all right, and he stated to me at that time that he had made his will and provided for Eugene in his will so that if he did not come back that he would be amply provided for, and we would carry out the understanding that we had with him."

Defendants introduced Mr. Middlebrook's letters of administration and the published notice and produced one witness on the merits, Doctor Leon Rosenwald. By him it was shown in chief that he became Doctor Adams' partner in 1897; that he knew the Kirks, husband and wife; that Doctor Adams was called upon to attend the last confinement of Mrs. Kirk (her third child) and did not go, but turned the case over to witness, and witness waited on Mrs. Kirk as her physician; that the Kirks paid for medical services at the birth of the last child, and that they paid Doctor Adams fees for waiting on them; that they paid him fees for waiting on the boy, Eugene; that Doctor Adams' account books came into witness' possession when he was associated with him, and he (witness) took hold of the books, and the Kirks owed a bill at that time and paid that; that the account on the books was a general account, including medical attention in Eugene's case, and the Kirks paid that; that he knew the condition of the boy, physically and mentally; and that he was a very bright boy, exceptionally bright — in fact, so bright and smart that the parents told witness they had to keep him back from school, because they were afraid he was advancing too rapidly. The witness further said that the boy's head was perfectly normal, was like "anybody else's head" in "bumps and so forth;" and it was not an unusual proceeding to deliver a child by means of forceps and it is done very frequently. At this point in Doctor Rosenwald's examination the boy, Eugene, was produced in court and his head was examined by witness, who was asked if there were any scars appearing, and replied there was a little scar on the forehead — a slight skin scar about one-third or half inch long at the margin of the hair; that he had made a close inspection of him and that was the only scar he could find; that no bones were fractured; that instruments are used in childbirth

on account of long labor, protracted labor, when a child does not advance for a certain period; that there is nothing unusual about using instruments in childbirth, and it was not unusual to have those scars because the instruments usually do make impressions in the skin.

On cross-examination, witness testified he knew that Doctor Adams was paid by the Kirks for his medical services because he (witness) took care of the bills, collected the money himself, and the money was paid to him for Doctor Adams by Mr. and Mrs. Kirk in installments — sometimes by one and sometimes by the other. The witness further testified that he (witness) had a suit pending for the Adams' estate himself, was suing for the whole estate; (see Rosenwald v. Middlebrook, 188 Mo. 58); that it was not unusual for a doctor to use instruments without a professional nurse to assist him, or anyone to asist him; that outside assistance depended a good deal upon the financial ability of the patient to pay; that a physician attending a childbirth ought not necessarily to have professional aid; that witness frequently had assistance in childbirth cases, but it did not have to be professional — anybody can do the work.

The foregoing is the whole case on the facts and pleadings.

I.  Plaintiff's first proposition is that Doctor Adams could make a contract with Mrs. Kirk for the benefit of her babe and could enforce such contract in her own name as trustee, she becoming a trustee of an express trust within the meaning of the statute. Defendants doubt that proposition when applied to the facts of this case, but we are inclined to concede plaintiff's contention, *arguendo* (without deciding the point) and pass to the merits. [R. S. 1899, sec. 541; and see authorities collated by the editor in vol. 1 Mo. Ann. Stat., p. 580; Wright v. Tinsley, 30 Mo. 389.]

II.   Cases of specific performance proceed upon the assumption that the contract to be performed is a valid contract, *i. e.*, one based on a valid consideration. Our first inquiry, then, should be to seek the consideration of the contract in suit.  Plaintiff's counsel argue the consideration lies in the compromise of a threatened suit for damages, but plainly the inquiry should go deeper.  The question still remains:  Whose suit? — what damages?

Obviously, if the babe itself had a cause of action based on its negligent injury by Doctor Adams, that liability was not compromised; for neither of the parents, under the record before us, was armed with present authority by the law to release Adams for damages resulting from injuries to the child in its own proper person.  They could not fritter away their child's right of action, if any, by capriciously swapping that right of action (sounding in damages *in praesenti*) for the mere chips and whetstones of general and vague promises tending to relieve them from its care and education, and to secure to it partnerships and other professional advancements — promises to be kept *in futuro* and which may be said to rest in such mere clouds as the Pleasures of Hope or Great Expectations, or on the sinking quicksands of loose talks, and, therefore, if the child had a substantial present right of action, it could have prosecuted its suit to recover such damages in due course of law unhampered by any defense predicated of a release, under the facts pleaded in plaintiff's petition.

Obviously, too, if the case is to proceed upon the theory that an injury to the unborn child is an injury to the person of the mother, then the husband had an independent right of action for his injury as husband, *per quod consortium amisit*.  [Womach v. St. Joseph, 201 Mo. 467, and authorities therein cited.]  Now, it is not contended the husband released his claim for dam-

ages, and, hence, no consideration for the contract in suit can be predicated of such release.

The case must stand or fall on the theory that the mother was negligently injured, and that her release of her damages for her injury supports the contract sought to be specifically performed.

Considering the injuries to the mother, it may be said that a fair and generous interpretation of the petition is that the pleader relied on injuries to the mother *through* injuries to the child while *en ventre sa mere,* and as a part of the mother. It is true it states the mother was injured, but there is no direct averment of any injury to the person of the mother apart from the alleged injury to her unborn child — the complaint being summed up in the following charge: "And so the said Charles W. Adams recklessly and negligently cut and bruised and injured the said Eugene Joseph Kirk, minor child, and the plaintiff, his mother, as aforesaid, *about the head of the said Eugene Joseph Kirk."* In the presence of the foregoing averment, it must be held that the stray and casual bits of testimony falling from the lips of Mrs. Hewer and the plaintiff's sister, to the effect that the mother was injured, are to be discarded as not responsive to the allegations in the petition, unless they be construed to be directed to proof of injuries to the child, and, therefore, in that sense, as injuries to the mother of whom the child formed a part.

Whether damages flowing from negligent injuries to a quick child about to be born—that is, ready and about to be severed from the mother under the mysterious and inexorable laws of nature — belong to the mother to be contracted away as she elects, or belong in the law to the child as a sentient being, is a most formidable, a most novel and anxious question. Few cases are in the books, where that question has been up. Under Lord Campbell's Damage Act it was held that

a posthumous child could sue to recover damages sus-tained by the death of its father. [The George and Richard, 3 Ad. & Eccl. (L. R.) *466.] The Supreme Court of Texas came to a similar conclusion under the statutes of that State. [Nelson v. Railroad, 78 Tex. l. c. 624, *et seq.*, where an illuminating discussion may be found. See, also, Railroad v. Robertson, 82 Tex. 657; 1 Blackstone Com., * 129-130; Aubuchon v. Ben-der, 44 Mo. l. c. 568, *arguendo*.] But it has been held that the common law gives no right of action to an infant for injuries received by it while *en ventre sa mere*. [Allaire v. St. Luke's Hospital, 184 Ill. 359; Dietrich v. Northampton, 138 Mass. 14; Walker v. Rail-road, 28 L. R. (Ireland) 69.] Of the Allaire case (de-cided in two appellate courts) it has been said: "How-ever, the reasoning in the support of these decisions is not eminently convincing, and the dissenting opinions in the most recent case on the subject are entitled to respectful consideration." [16 Am. and Eng. Ency. Law (2 Ed.), 261.]

Counsel on both sides of the case at bar, though well-equipped in learning and scholarly disposition, have not favored us with briefs on this point, con-tenting themselves with assuming that the right of action for prenatal injuries to a quick child about to be born rests in the mother and not in the infant. It is, therefore, best not to preclude the question by a decision of the point under such circumstances, but leave it open to be determined when a case arises wherein the matter confronts us face to face as de-cisive.

III. For the purposes of the case, then, allowing injuries to a quick child about to be born to be injuries to the person of the mother, we confront the question whether the child was in fact injured by the use of instruments in childbirth, and (what is more to the point) the further question whether such injuries, if

any, were received at the hands of Doctor Adams *negligently*. The case is left in an exceedingly shadowy condition on the latter point by the proof of plaintiff. The marking and scarring of the child's head were shown by that proof, but negligence on the part of the attending physician rests alone on alleged admissions of that physician whose lips are sealed by the finger of death. Not only so, but plaintiff's case proceeds on the theory there was a settlement of the damages at the very considerable sum of $5,000, to be paid in education, etc., or (failing in that) by a bequest by will. On defendant's part there was evidence tending to show that the child was not permanently injured; and it was further shown by uncontradicted evidence that it was not unusual to use instruments to aid childbirth, nor was it unusual for a physician to use such instruments without the assistance of a professional nurse or another physician, nor was it unusual to leave marks on the child by the use of forceps. We have gone through the evidence adduced by plaintiff line by line to find proof of negligence. Certain it is, that the fact that the child was marked with a skin mark by the use of forceps is not conclusive evidence of negligence *per se*. Certainly, the fact that the child was weakly, slow in learning to walk, called for and received tender nursing, was subject to sickheadaches on exertion, had to be kept back in school, *etc.*, taken by and large do not prove malpractice at birth. Such train of drawbacks is common to many children and arises from many causes. If in this case these facts and the further fact in proof that the babe was marked are attributable to a negligent use of instruments at childbirth, then the connection should have been proved by competent medical testimony and not left to the opinions of lay witnesses, whose sympathies are warmly enlisted, and whose conclusions are of little (if of any) value. There was open to plaintiff the whole faculty of physicians in

Kansas City (learned, many, and, doubtless, armed with opinions) and the whole realm of medical science from which to adduce evidence in support of the charge that her child was negligently injured; but the case in this regard is allowed to rest on the fading and failing memory of two worthy ladies who essay to tell admissions of Doctor Adams made many years before to the effect that he was in fault.

To such a case as this the views of Justice BROWN in Kirby v. Tallmadge, 160 U. S. 1. c. 383, are quite applicable. In that case the learned justice adopts the language of Lord MANSFIELD in Blatch v. Archer (Cowper 63, 65), viz.: ''All evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other side to have contradicted.''

When the matter is viewed in the foregoing light, and when it is recalled that a generous and effusive physician might blame himself for a mere *misadventure* without intending thereby to touch the point of his professional honor or admit civil liability in damages for malpractice, and when it is recalled that the memory of witnesses is somewhat inadequate to the reproduction of ancient conversations without slip and in just relation to the subject-matter, and that testimony of the kind in review is not deemed of high grade or of much probative force, it would appear that the learned chancellor might well have dismissed plaintiff's bill on the theory there was no original liability shown, and, therefore, no consideration for the contract in suit; for it is not every contract that will be specifically enforced. The specific performance of a contract is directed to the sound discretion of the chancellor. [2 Story, Eq. (13 Ed.), secs. 769-770.] A contract demanding specific performance must not be biting, unconscionable, supported by a foggy and uncertain consideration, but

must be just, fair and reasonable and grounded in an unequivocal consideration.

IV.   If the contract in suit is to be enforced, it not being in writing, its enforcement is in the very teeth of two written laws — i. e., the Statute of Frauds and Perjuries, and the Statute of Wills.   Therefore, at law it was non-enforceable.   As equity follows the law, it is non-enforceable in equity, except on one high condition; and such condition arises when the non-enforcement of the contract would work an equitable fraud upon the promisee; that is, the conscience of the chancellor is stirred and relief is extended in his open palm when, and only when, it is certain beyond the peradventure of a doubt that to deny the relief would be to strike down the underlying purpose of the Statute of Frauds, to-wit, the prevention of frauds and perjuries. And thus it comes to pass that equity discerns the essence of the law and administers the soul of it.

When a court of equity is called upon to exercise this high and delicate function, it asks, as an irreducible minimum of those who seek relief, proof showing beyond a reasonable doubt: first, not only that some contract existed, but that the precise contract in suit existed; second, the terms of the contract should be so clear and definite as to leave no doubt in intendment and certainty; third, performance on the part of the promisee should be shown, and that performance must be unequivocal and must in its own nature be referable alone to the very contract sought to be performed because it is only by performance (whereby the party to be charged is benefited), that the conscience of the promisor and those claiming under him is bound; fourth, and the acts relied on to show performance must point to the contract in suit and to none other.

In short, there must be certainty in the proof beyond a reasonable doubt, and certainty in the pleadings,

and from end to end no equivocation in the case. [Berg v. Moreau, 199 Mo. 416; Russell v. Sharp, 192 Mo. 270; Woodbury v. Gardner, 77 Me. 70; Kinney v. Murray, 170 Mo. 674; Asbury v. Hicklin, 181 Mo. 658; Rosenwald v. Middlebrook, 188 Mo. 58; Grantham v. Gossett, 182 Mo. 651.]

No good purpose would be subserved by critically going over the testimony and pointing out its inconsistencies and its failure to sustain the allegations of the bill relating to the terms of the contract. It must challenge attention that Mr. Kirk puts himself in the capacity of an agent for his wife. Now, according to Mrs. Hewer and Miss Ryan a settlement was arrived at and a contract made at once, in the very confinement room and in the presence of the mother (alarmingly ill) and father and those two witnesses; but according to the husband and agent no contract for a settlement was made at such inauspicious time, for we find him going weeks afterwards charged with the mission of making a settlement, and the reading of his testimony shows how vague and loose was the talk between him and Doctor Adams and how essentially variant it was from the contract pleaded in the petition. We need not comment on the imperfection of memory on the part of Mrs. Hewer who puts herself in the attitude of being invited to witness a will and gives the *minutiae* of conversations ("the very words") and makes a list of those present and taking part in the same, but who at the same time forgot the important fact that Miss Ryan was present and that she had been invited by Miss Ryan not to witness a will but to pay her respects to a soldier about to depart to the wars. One thing is certain. There is not one word in black and white to sustain this case. There is even the absence of a receipt given by plaintiff whereby she released her damages to Doctor Adams. The payment by plaintiff and her husband for medical services rendered by Doctor

Adams to the boy Eugene is totally at variance with
the theory that there was a contract of the character
in suit, or of the character testified to by Mr. Kirk.
So, too, it taxes human credulity that Doctor Adams
would have been honored by plaintiff by the perpetua-
tion of his memory in the name of the third child and
that his relations with the Kirks and their sister-in-law
would have been as sentimental as the evidence points,
if the bond that bound them was a cold contractual
obligation having its root in the galling threat of a
damage suit for malpractice.

That Doctor Adams was interested in the boy
Eugene is as plain as a pikestaff; that he indulged him-
self with, and excited hopes of the boy's parents by,
promises looking to his advancement and preferment,
is plain; that at spells he was warmed by a benevolent
testamentary disposition towards the child is also
plain; that he never screwed his courage to the stick-
ing point of making a will in accordance with that
benevolent disposition is also plain; that the Kirks
stored away and nursed these promises and were sol-
icitous for their fulfillment is natural and plain. But
when he came to the making of a will, it can be said of
him, as set forth in the speculation of the melancholy
Dane, viz.:

> "And thus the native hue of resolution
>  Is sicklied o'er with the pale cast of thought,
>  And enterprises of great pith and moment
>  With this regard their currents turn awry,
>  And lose the name of action."

It cannot be said that the conduct and language
under review point unvaryingly to an enforceable con-
tract between the dead physician and plaintiff and
leave the case without doubt. Much of that conduct
and much of that language (as said) point to a fond-
ness for the child, to current benefactions and an ef-
fusively benevolent testamentary disposition towards

him; and, when all is said, in my opinion, they may be more directly attributable to that testamentary disposition and that fondness than to a recognized and subsisting contract.

Rich, sick with an incurable disease, addicted to the use of stimulants conducing to garrulity, prone to make (and extravagant in) promises, an object of sympathy while commanding a large practice and circle of friends, Doctor Adams' story is told in Rosenwald v. Middlebrook, *supra*. In that case, on evidence eminently more cogent and convincing than here, it was sought to fasten upon him a contract to make a will in favor of Doctor Rosenwald, casting his whole estate upon the latter as devisee. Rosenwald filed his bill on July 31, 1901. Shortly thereafter, plaintiff brought her suit. At that time this great estate hung dangling in the air as a prize and it seemed possible it might escheat to the State of Missouri; for the heirs were unknown. [R. S. 1899, sec. 7381.] A contract of the character involved in that case, as in this, is the object of sharp judicial solicitude and jealousy. Time and time again it has been pointed out that loose, casual remarks, long gone by and poured from the leaking cup of human memory into the judicial ear, are insidiously dangerous, and, therefore, inadequate to afford the stringent proof demanded by the law to set aside the Statute of Wills and the Statute of Frauds. Rosenwald, cast below before the same learned chancellor sitting in this case, appealed to this court and the judgment against him was affirmed. As was done there, so let it be done here.

The judgment dismissing the bill is, accordingly, affirmed.

All concur, except *Woodson, J.*, not sitting.